# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## (Alexandria Division)

| | |
|---|---|
| **EVAN AMBER OVERTON AND JOHN KEENAN OVERTON , CO-ADMINISTRATORS FOR THE ESTATE OF EZRA MICHAEL OVERTON, DECEASED**,<br><br>Plaintiffs,<br><br>*v.*<br><br>**FISHER-PRICE, INC**;<br><br>AND<br><br>**MATTEL, INC.**<br><br>Defendants. | Case No. 1:19-cv-751 |

## COMPLAINT

Plaintiffs Evan Amber Overton and John Keenan Overton, Administrators for the Estate of Ezra Michael Overton, Deceased, move for judgment jointly and severally against the Defendants Fisher-Price, Inc. and Mattel, and in support of their Complaint, allege as follows:

## INTRODUCTION

1. For nearly a decade, Defendants marketed and sold the Rock 'n Play Sleeper (the "Sleeper") as a baby product that they represented was safe for "all-night sleep." Millions of consumers purchased the product expecting that it would be safe for their infant children. The Sleeper was defective and dangerous, causing injury and death by asphyxia to babies who sat or slept in it. Fisher-Price and its parent company, Mattel, knew about the dangers of their product prior to marketing the product – and about actual deaths and injuries which had occurred – but

brought it to market and continued to sell millions of units of the product and insist that it was safe until they were finally forced to recall it on April 12, 2019.

2. That recall came too late to prevent the tragic December 22, 2017 death of Ezra Overton, the five-month-old son of Keenan Overton and Evan Overton. Ezra died of asphyxia while sleeping in a Sleeper.

**Jurisdiction and Venue**

3. This Complaint asserts claims pursuant to Virginia's wrongful-death statute.

4. Jurisdiction is founded on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332.

5. The court has personal jurisdiction over Defendants because each engaged in continuous and systematic contacts with the Commonwealth of Virginia.

6. Venue is proper pursuant to 28 U.S.C. § 1391 (a) because Plaintiffs' deceased died in Alexandria (Fairfax County), Virginia as a result of a defective Fisher-Price Rock 'n Play Sleeper (the "Sleeper").

**Parties**

7. Ezra Overton, an infant, lived with his parents Evan Amber Overton and John Keenan Overton in Fairfax County, Virginia until he died at the age of five months on December 22, 2017 as a result of suffocating in a Sleeper.

8. On May 2, 2019, Evan Amber Overton and John Keenan Overton were duly appointed by the Circuit Court of the County of Fairfax, Virginia as the "Co-Administrators for the estate of Ezra Michael Overton, deceased, pursuant to §64.2-454 of the 1950 Code of Virginia, as amended for the sole purpose of a wrongful death or personal injury suit." A copy of the Certificate of Qualification is attached as Exhibit 1.

9. Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business in New York.

10. Fisher-Price, Inc. is a subsidiary of Mattel, Inc.

11. Defendant Mattel, Inc. is a Delaware corporation with its principal place of business in California.

12. At all times relevant, Defendants acted by and through their employees, agents, and servants, who were acting within the scope of their employment, agency, or master-servant relationship with Defendants.

## FACTS

### The Sleeper

13. Defendants imported the Sleeper, an inclined infant sleeper product, from China, where it was manufactured.

14. Defendants first marketed and sold The Sleeper in the United States in 2009.

15. Defendants marketed and expressly represented to consumers that the various models of the Sleeper were designed, suitable and safe for "all-night sleep." (See e.g., Figure 1).[1]

 Figure 1

---

[1] Photo of Auto Rock 'n Play Sleeper promoted "for all-night sleep," https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/

16. The Sleeper was designed as a flexible folding frame with a fabric hammock and hard plastic, curved form suspended between the legs. The product has high sides and sits at an incline, causing the infant placed in it to also lay at an incline.

17. The Sleeper comes with padded inserts positioned behind and up to the sides of the infant's head and body. The shape of the Sleeper's hammock includes an additional angle where the infant's torso meets the legs that causes the infant to lie in a seated position. *See* figures 2 and 3 below.[2]

 

Figure 2.                                                    Figure 3.

18. The Sleeper was designed to rock forward and back.

19. Defendants advertised the Sleeper to be used for both sleep and playtime.

20. On April 12, 2019, as a result of media reports of multiple infant fatalities, Fisher-Price recalled "all Rock 'n Play Sleepers." The recall covered approximately 4.7 million units.

**Ezra's Sleeper**

---

[2] Photos of Newborn Rock 'n Play Sleeper – Luminosity, https://fisher-price.mattel.com/shop/en-us/fp/newborn-rock-n-play-sleeper-luminosity-bmm97 (last accessed Apr. 18, 2019).

4

21. Ezra Overton was born on July 9, 2017.

22. Friends of Ezra's parents gave them a Sleeper to use for Ezra ("Ezra's Sleeper") in or around August or September of 2017.

23. Ezra's Sleeper model was the Fisher-Price My Little SnugaMonkey Deluxe Rock 'n Play Sleeper, Model number BGB20. *See* Figure 4 below for an example of the SnugaMonkey Deluxe model[3].



Figure 4.

---

[3] Photograph of "My Little SnugaMonkey Deluxe Rock n' Play Sleeper, https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/my-little-snugamonkey-deluxe-rock-n-play-sleeper-bgb20

24. Like all Sleepers, Ezra's Sleeper was designed, marketed and sold as an all-night sleeper.

25. Defendants expressly represented in their marketing materials that the features on Ezra's Sleeper model included the following:

– "It's a comfy inclined sleeper and playtime seat all in one…;"

- "A deep inclined seat with an ultra- plush headrest (with sweet monkey ears!) and insert helps baby sleep all night long;"

- "Comfy incline helps baby sleep;"

- "Sleeper & playtime seat in one;"

- "Designed with restful nights in mind, this sleeper has a comfortable incline for your little one!;"

- "As baby drifts off into dreamland, deluxe fabrics, a plush newborn insert, calming vibrations and a gentle incline help baby feel safe and secure;" and

- "The comfortable, restful environment this sleeper provides helps baby wind down and relax with a consistent sleepy-time routine."

25. Ezra's Sleeper contained no warning on the front or sides or the crotch strap of the Sleeper. Hidden from view on the underside of the Sleeper, where it was not visible to the consumer, was the following statement:

> Warning Label – Failure to follow these warnings and the instructions could result in serious injury or death.
> - ALWAYS use the restraint system.
> - Always use the pad provided, which includes restraint. NEVER add a mattress, pillow, comforter, or padding.
> - SUFFOCATION HAZARD – Infants can suffocate in gaps between an extra pad and the side of the product – on soft bedding.
> - FALL HAZARD – To prevent falls, DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs. (11.3 kg), whichever comes first.

6

- Strings can cause strangulation! NEVER place items with a string around a child's neck such as hood strings or pacifier cords. NEVER suspend strings over product or attach strings to toys.
- NEVER place product near a window where cords from blinds or drapes can strangle a child.
- To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians recommend healthy infants be placed on their backs to sleep, unless otherwise advised by your physician.
- Always provide the supervision necessary for the continued safety of your child.
- When used for playing, never leave child unattended.

### **Defects**

26. At the time it left the Chinese manufacturer's hands and at the time that it left the Defendants' hands, Ezra's Sleeper was unreasonably dangerous for use as an infant sleeper because (1) its shape and design permits infants to move themselves into a position in which their face is against soft padded surfaces of the Sleeper and they are unable to breathe, resulting in suffocation, (2) because the degree of incline causes infants' heads to slouch into a position that can cause positional asphyxia, and (3) because its warning was inadequate concerning its hazardous properties and was hidden from consumers.

27. The manner and purpose for which the Overtons used Ezra's Sleeper was the same manner and purpose for which it was designed, manufactured, marketed and sold – as a baby sleeper.

### **Defendants' Were on Notice of the Defective and Unreasonably Dangerous Conditions of their Sleepers**

28. Defendants expressly warranted that Ezra's Sleeper was safe for all-night sleep even though they had been warned and continued to be warned by medical and governmental entities, consumers and others of the unreasonably dangerous nature of the product.

29. The American Academy of Pediatrics (AAP) is an organization of approximately 67,000 pediatricians committed to protecting the health and well-being of infants and children.

30. As far back as 1992, the AAP recommended that babies should sleep on flat, firm surfaces, not inclines, and that they should be put to bed on their backs without anything in the sleeping area that could suffocate the baby.

31. In 2005, the AAP issued a Policy Statement – *The Changing Concept of Sudden Infant Death* Syndrome*: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider in Reducing Risk*. These guidelines reaffirmed that infants should be placed on their backs to sleep and that firm sleeping surfaces be used. "A firm crib mattress, covered by a sheet, is the recommended sleeping surface."

32. Upon information and belief, before Defendants marketed the Sleeper, Defendants' only medical consult – a consulting physician who was not a pediatrician- recommended that Defendants change the design of the Sleeper to prevent infants from being able to push themselves into a standing position while in the Sleeper, a hazard reported to Fisher-Price prior to the marketing of the product. Defendants ignored this recommendation.

33. In 2011, following updated research, the AAP expanded its safe sleep recommendations to include a "firm sleep surface."[4] The AAP also warned that "[c]ar seats and other sitting devices are not recommended for routine sleep." In addition, the AAP at the same time recommended that infants not sleep next to "soft objects," including "pillows," "bumper pads" and "positioners."[5]

---

[4] *AAP Expands Guidelines for Infant Sleep Safety and SIDS Risk Reduction* (Oct. 18, 2011), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Expands-Guidelines-for-Infant-Sleep-Safety-and-SIDS-Risk-Reduction.aspx (last accessed Apr. 18, 2019).
[5] *Id.*

8

34. In 2011, AAP recommendations also recognized the particular risk to very young infants: "Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."[6]

35. Internationally, Fisher-Price and Mattel faced opposition to bringing the Sleeper to market. For example:

a. Around January 2011, Australian regulators found that the Sleeper was *not safe for infant use as a sleeper* because it was contrary to safe sleep recommendations and the angle allowed babies' airways to be blocked.[7] Australia never permitted the sale of the Sleeper.

b. Canadian authorities also took issue with the Sleeper being sold as a "sleeper," opting to allow the product to be sold only as a "soother" because of Canadian safe sleep recommendations raised by Health Canada in February 2011.[8]

c. Also in February 2011, organizations in the United Kingdom told Fisher Price that the product was not safe as a sleeper and safe for only short periods of use for play. In fact, a Consumer Reports investigation revealed internal Fisher-Price communications which acknowledged negative findings from the United Kingdom's Royal College of Midwives and stated: "I'm afraid the findings don't have good implications for a UK launch."[9]

36. As a result of placing their defective product into the marketplace, Defendants have been sued on multiple occasions regarding the dangers of the Sleeper and injuries and deaths the product has caused.

---

[6] *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for Infant Sleeping Environment* (Nov. 2011), https://pediatrics.aappublications.org/content/128/5/1030 (last accessed Apr. 18, 2019).
[7] Consumer Reports Investigation Article.
[8] *Id.*
[9] *Id.*

37. On July 21, 2015, the parents of a two-month-old infant in Texas sued Defendants and another manufacturer for the death of their infant daughter caused by the Sleeper.[10] In that case, an infant asphyxiated while lying in the Sleeper in 2013.

38. On July 25, 2016, the parents of a seven-week-old infant in Georgia sued Defendant Fisher-Price for injuries to the infant while using the Sleeper.[11] The infant stopped breathing and became nonresponsive when his head tilted to the side while in the Sleeper. The injured infant's pediatrician subsequently concluded that the Sleeper's defective design caused "Upper Airway Obstruction from Head Being in a Flexed Position." The infant required long-term monitoring and will be evaluated for developmental delays as he grows.

39. Also in 2016, parents of an infant in Tennessee sued Defendant Fisher-Price for plagiocephaly the Sleeper caused to their son.[12] In November of 2012, the infant's pediatrician diagnosed him as having extremely severe plagiocephaly because the infant's "skull, face and jaw were all distorted as a result of positional plagiocephaly." The pediatrician opined that the product's defective design forced the infant's head into a particular position, thereby preventing the even distribution of pressure on the infant's head and causing it to be prematurely deformed.

### Ezra's Death by Suffocation

40. On or about the late evening of December 21, 2017, Keenan and Evan Overton placed Ezra in Ezra's Sleeper and fastened the restraint.

41. Ezra fell asleep in Ezra's Sleeper, so Keenan placed the sleeper on the floor next to the sofa where Keenan sat.

---

[10] *Torres v. Imperial Manufactory Ltd.,* No. 7:15-cv-00444 (S.D. Tex.) (removed the Federal District Court Oct. 23, 2015).
[11] *Goodrich v. Fisher-Price, Inc.,* No. 1:16-cv-03116 (N.D. Ga.) (removed to Federal District Court Aug. 24, 2016).
[12] *Hart v. Fisher-Price, Inc.,* No. 3:17-cv-00008 (M.D. Tenn) (removed to Federal District Court Jan 5. 2017).

42. With the exception of a pacifier and a receiving blanket over his lower legs, there were no pillows, pads or other objects in Ezra's Sleeper as he slept other than the fabric and padding that came with Ezra's Sleeper.

43. Keenan fell asleep on the sofa. When he awoke, he observed that Ezra appeared to have pushed himself up into a standing position; that Ezra's head was turned into the monkey face toward the side/back of Ezra's Sleeper and was pressed against the padded fabric; and that Ezra appeared to be stiff and lifeless.

44. Keenan removed Ezra from Ezra's Sleeper and tried unsuccessfully to resuscitate him.

45. Ezra died on December 22, 2017 from asphyxia by suffocation.

## COUNT I: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Unreasonably Dangerous Design and Inadequate Warning)

46. Plaintiffs repeat, re-allege and incorporate herein all previous paragraphs.

47. Defendants were "sellers" and "merchants" within the meaning of the Virginia Commercial Code.

48. There was an implied warranty by Defendants that Ezra's Sleeper would be fit for the purpose for which it is ordinarily used.

49. The purpose for which the Sleeper, including Ezra's Sleeper, is ordinarily used is as a baby sleeper and playtime seat.

50. The Defendants specifically advertised and expressly warranted that the Sleeper, including Ezra's Sleeper, was safe for all-night sleep.

51. At all times relevant, including when it left Defendants' hands, Ezra's Sleeper was unreasonably dangerous for its intended and reasonably foreseeable purposes.

52. Ezra's Sleeper was unreasonably dangerous because it was not fit for unsupervised infant sleep or use (1) because its shape and design permits infants to move themselves into a position in which their face is against the padded surface of the Sleeper and they are unable to breathe, resulting in asphyxia by suffocation, (2) because the degree of incline causes infants' heads to slouch into a position that can cause positional asphyxia, and (3) because its warning was inadequate concerning these hazardous properties and was hidden from consumers.

53. Ezra's parents used Ezra's Sleeper in a reasonably foreseeable manner; indeed the Defendants advertised and warranted that the product was safe for all-night sleep.

54. Ezra was restrained in Ezra's Sleeper when he died.

55. The restraint system contributes to the unreasonably dangerous condition of the product as it is affixed only to the fabric hammock and not to a hard, stationary surface.

56. Defendants had reason to know and did know prior to Ezra's death that infants, by pushing their feet on the foot rest area of the Sleeper, are able to push themselves up in the seat into a standing position. Because the crotch restraint is attached to the fabric and not to a fixed surface and is long enough to allow the infant to stand while restrained, the fabric rides up with the infant as he or she pushes up. Once this occurs, the infant becomes stuck in a semi-standing position and is unable to slide back down into a seated position. The restraint as designed does not prevent the infant from being able to push up in the seat into a position from which he or she cannot retreat. Unable to return to the seated incline position, the infant tires and turns his or her face into the padded fabric.

57. Defendants became aware during their initial limited testing of the product and from litigation-related testing conducted prior to Ezra's death that babies could push themselves up into a standing position from which they could not get down.

58. In response to this knowledge gained from the initial limited testing, the Defendants' consultant recommended that the foot area of the Sleeper be re-designed to a loose mesh to prevent push-ups.

59. Defendants did not implement this recommendation.

60. The design defect of Ezra's Sleeper and its defective warning outlined in the preceding paragraphs are each a precise proximate cause of Ezra's asphyxia and death on December 22, 2017.

61. While he was restrained in Ezra's Sleeper, Ezra was able to maneuver himself into a standing position with his face pressed against the padded surface, and he was unable to slide back down into a seated position with his airway unblocked. With his face pressed against the padding, Ezra was unable to breathe, so he suffocated.

62. Because Ezra's Sleeper was intended to be used for sleep, including unsupervised all-night sleep, it would not and cannot pass without objection in the trade because its design causes positional asphyxia and asphyxia by suffocation.

63. Defendants breached the implied warranty of merchantability by designing, marketing and selling this unreasonably dangerous product for all-night sleep, and for inadequately warning parents and other infant caregivers of the hazards of the product.

64. As outlined in detail above, Defendants knew, or by the use of ordinary care had a reason to know, that their product was potentially dangerous, that this danger was not obvious or readily discoverable by the buyers or users of the product, and that injury or death reasonably could be anticipated.

65. Defendants had a duty to give an adequate warning of the dangers.

66. The hidden warning on the underside of Ezra's Sleeper was inadequate because it could not be expected to catch the attention of a reasonable person.

67. The hidden warning on the underside of Ezra's Sleeper was inadequate because it could not be understood by a reasonable person to warn that infants could suffocate even if the caregiver used the product in its original condition, without adding padding or soft bedding.

68. The hidden warning on the underside of Ezra's Sleeper was inadequate because it did not reasonably inform the consumer of the nature and extent of the hazard.

69. The back of the head dam, on which is the warning is located, fails to keep its upright position as the chair is opened and closed, causing the warning not to be visible when the product is in the manufacturer's recommended use position to a person standing near the product at any one position around it.

70. The product posed a known risk of suffocation in its original condition, even without the addition by the caregiver of extra padding or bedding, and thus it was not reasonably safe or fit for unsupervised use, let alone all-night sleep.

71. Defendants had a duty to warn caregivers that the product was not fit or safe for unsupervised use, and failed to do so. Though some of the models stated "Never Leave Child Unattended", Ezra's chair had no such warning.

72. As a direct and proximate result of the breach of implied warranty by Defendants, Ezra died; and his statutory beneficiaries suffered, and will continue to suffer, sorrow, mental anguish, and solace, including the loss of their son's society, companionship, comfort, guidance, kindly offices and advice; loss of their son's future services, protection, care, and assistance; and funeral expenses.

***WHEREFORE***, Plaintiff prays for judgment and an award of execution against all Defendants, jointly and severally, in the sum of TWENTY-FIVE MILLION AND 00/100 ($25,000,000.00), plus costs of this suit, all applicable interest, and such other and further relief

as this Court deems just and proper.

TRIAL BY JURY IS DEMANDED.

Respectfully submitted,

/s/ Michael G. Phelan, Esq._____
Michael G. Phelan, Esq. (VSB No. 29725)
Jonathan M. Petty, Esq. (VSB No. 43100)
Brielle M. Hunt, Esq. (VSB No. 87652)
PHELAN PETTY, PLC.
6641 West Broad Street, Ste. 406
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
jpetty@phelanpetty.com
bhunt@phelanpetty.com


Jan V. Hinson, Esq. (SC Bar No. 101498,
        (GA Bar No. 356817)
LAW OFFICES OF JAN V. HINSON, P.C.
330 East Coffee Street
Greenville, SC 29601
864-527-5933 – SC Telephone
877-797-3571 – Facsimile
11175 Cicero Drive, Suite 100
Alpharetta, Georgia 30022
678-242-5208 – GA Telephone
jan@janhinsonlaw.com

*Counsel for Plaintiffs*