IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| EVAN AMBER OVERTON AND JOHN KEENAN OVERTON, CO-ADMINISTRATORS FOR THE ESTATE OF EZRA MICHAEL OVERTON, DECEASED,<br><br>    Plaintiffs,<br>v.<br><br>FISHER-PRICE, INC;<br><br>AND<br><br>MATTEL, INC.<br><br>    Defendants. | Case No.: 1:19-cv-751 |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR AN ORDER COMPELLING DISCLOSURE OR DISCOVERY AND TO REVISE DISCOVERY PLAN**

In support of their Motion for an Order Compelling Disclosure or Discovery and to Revise Discovery Plan pursuant to FRCP 37, Plaintiffs state as follows:

**FACTS**

This product liability case arises out of the December 22, 2017 death of a 5 month-old infant from suffocation in a Fisher-Price Rock 'n Play Sleeper (RNP Sleeper), a product that was recalled on April 12, 2019 after Consumer Reports exposed over 32 instances of infant deaths by suffocation or asphyxia. Attached as **Exhibits A through E** respectively are Plaintiffs' discovery requests, which were served on September 16, 2019, and Defendants' objections and responses thereto. Among the information that plaintiffs have been seeking since September 16, 2019 are evidence of "other incidents" involving the RNP Sleeper, communications by and between

defendants and the Consumer Product Safety Commission (CPSC) concerning the April 2019 recall, and all information upon which defendants relied, if any, to determine whether the RNP Sleeper was safe for overnight sleep. Production of the other incident materials remains incomplete, defendants have yet to produce any non-public records concerning the recall, and requests regarding safety testing are subject to layers of objections. Plaintiffs do not have a forthright response to what, if anything, defendants did prior to marketing the RNP Sleeper to determine if it was safe for overnight sleep. In the meantime, the deadline for Plaintiffs' Expert Disclosures, which defendants consented to extending once already after plaintiffs complained about defendants' unwieldy document dump, is December 6, 2019.

This dispute arises as a result of defendants' use of document dumps in violation of FRCP 34, incomplete and evasive discovery responses and an unreasonable attempt to limit certain discovery to the specific model of RNP Sleeper in which the Overton infant suffocated. The resulting delay has prejudiced plaintiffs and rendered unworkable the existing discovery deadlines. The evidence below sets forth the absurdity of defendants' initial refusal to produce "other incident" information beyond incidents involving the SnugaMonkey model of the RNP Sleeper.

Further evidence of defendants' duplicity is defendants' November 27, 2019 letter to counsel regarding this discovery dispute in which defendants wrote that "the differences among the other various models of Rock 'n Play Sleeper are either largely cosmetic in nature or provide additional functions, like the Smart Connect and auto rocker features, which are not relevant to Plaintiffs' claims in this case."[1] Plaintiffs spent weeks trying to get defendants to clarify their position on whether they would produce "other incident" information on all models of RNP

---

[1] *See* 11/27/2019 letter from Stephen T. Fowler, p. 2, no. ¶4 contained in **Exhibit F** (11/20/19, 11/23/19 and 11/27/19 letters reflecting attempts to resolve the subject discovery disputes)

Sleeper and all documents leading up to and concerning the April 209 recall.  As of November 27, 2019, defendants represent that they have produced among the document dump "all reports involving an allegation of a **fatality** involving a Rock 'n Play Sleeper that Defendants were aware of before the December 22, 2017 incident…." *Id*. (emphasis added).  Defendants are not agreeing to produce incidents in which infants nearly died from asphyxia or suffocation but were saved or incidents of which defendants became aware after December 22, 2017.  There are many such incidents.  The absurdity of defendants wasting time arguing that any aspect of discovery should be limited to the SnugaMonkey model is evidenced by the facts below.

### I.  Defendants Knew Before They Marketed the RNP Sleeper That Inclined Sleepers Were Unsafe.

According to its patent application, the RNP Sleeper is inclined upwards on one end to raise a baby's head and torso up to approximately 32 degrees.  Among the primary organizations providing standards for safe infant sleep is the American Academy of Pediatrics (AAP), which is a non-profit organization comprised of over 66,000 primary care pediatricians, pediatric subspecialists and pediatric surgeons.  As early as 1991, the AAP recommended that infants be placed on their backs to sleep. The concept of the inclined sleeper violates lessons learned from decades of scientific research into Sudden Infant Death Syndrome (SIDS).  In 1994, the AAP and the U.S. National Institute of Child Health and Human Development (NICHD) unveiled the "Back to Sleep" campaign to combat SIDS.[2]  The campaign urged parents to lay their babies down in a supine position to sleep, and was based on extensive research showing that inclined and other sleep positions increased the risk of infant death.[3]

---

[2] NICHD, Explore the Campaign, available at   https://safetosleep.nichd.nih.gov/activities/campaign (last accessed 11/23/19).
[3] *Id*.

This point has been stressed by the AAP multiple times over that past several decades. In 2005 – more than four years before defendants first marketed the RNP Sleeper- the AAP revised its infant sleeping guidelines, stating that "[i]nfants should be placed in a supine position (wholly on the back)," and that "a firm crib mattress…is the recommended sleeping surface", and with no soft bedding or object in the sleeping environment.[4]  The AAP expanded its guidelines in 2011, re-asserting its recommendation in favor of supine sleeping, and specifying that:

> Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home.
> ….
> If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as practical.[5]

In the face of this scientific consensus, from 2009 until it was recalled in April 2019, defendants marketed their RNP Sleeper as safe for unsupervised, all-night sleep, despite the fact that defendants had done no medical safety tests to determine if such representations were true.[6]

## II. Defendants' Rock 'N Play Sleeper Violated Consensus Safe Sleep Recommendations.

In 2008, Linda Chapman, a Fisher-Price designer, developed the concept of an inclined, upright sleeper for babies.  Her prototype eventually became the RNP Sleeper, which was marketed for use by all babies for overnight sleep. There is one patent that covers all models of RNP Sleeper.  The **common design for all models** was a collapsible frame which supported a fabric hammock with tall sides, forcing the infant into a reclined position, with its head elevated

---

[4] https://www.ncbi.nlm.nih.gov/pubmed/16216901 and https://pediatrics.aappublications.org/content/116/5/1245 (last visited 11/22/2019).

[5] AAP Policy Statement, *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment*, available at https://pediatrics.aappublications.org/content/pediatrics/128/5/1030.full.pdf (2012) (last accessed 11/23/19).

[6] See "Fisher-Price invented a popular baby sleeper without medical safety tests and kept selling it, even as babies died," https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-died/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?arc404=true (last visited 11/23/19).

at approximately a 32 degree angle from the lowest part of the baby's torso,[7] a crotch strap designed to be placed around the baby's hip/waist area, and a hard-plastic shell inside the hammock that was covered with soft padded bedding and, in some models, soft objects such as animal faces and floppy ears. An image of the SnugaMonkey model, in which Plaintiffs' Decedent died, is shown below as Figure 1:

**Figure 1 – "SnugaMonkey" insert**



Shown below as Figures 2 and 3 are images of the RNP Sleeper "My Little Lamb" and "SnugaPuppy" models. Figures 1-3 are three examples of the many models of RNP Sleeper, all of which come under the same patent and share the same basic design.

---

[7] *See* Patent Application attached as **Exhibit G**.

**Figure 2 – "My Little Lamb" insert**



**Figure 3 – SnugaPuppy insert**



The RNP Sleeper was advertised and intended for overnight sleep. Indeed, the package for the SnugaMonkey model stated conspicuously that "Baby can sleep at a comfortable incline all night long!" The package also contained the words "Extra-plush fabric" juxtaposed next to

an image of a sleeping baby with extra-plush fabric pushed up next to his or her face.  *See* Figure 4 below:

**Figure 4 – SnugaMonkey package**



Packaging for other models contained similar representations, such as, "**Inclined sleeper designed for all-night sleep**."  *See e.g.*, Figure 5 below.

**Figure 5 – Auto Rock 'n Play Sleeper package**



One can tell from a cursory review of the above images that the RNP Sleeper, including the SnugaMonkey model, violated long-standing safe sleep recommendations. The RNP was not flat and did not allow a baby to sleep in a supine, horizontal position. Many RNP Sleeper models included dangerous, extra-plush fabric, which posed a suffocation hazard. What is not evident from the images is that the 9" – 12" crotch strap portion of the restraint was not affixed to the hard shell (it was sewn through the soft fabric cover) and was inadequate to prevent a baby from standing up and rolling over in the sleeper while supposedly restrained.[8]

Defendants admit that the RNP Sleeper was manufactured in China and imported by defendants. Prior to selling this Chinese product in the United States, defendants lacked any data to show and did no testing to determine whether the inclined RNP was safe for unattended infant sleep. Instead of conducting testing or heeding the consensus safe sleep recommendations of the pediatric medical community, defendants relied upon the advice of Gary Deegear, M.D., a family physician in San Antonio, Texas with a background as a litigation consultant. Dr. Deegear lost

---

[8] Defendants were aware of this problem before they marketed the product. After defendants received pre-market evidence that babies could push to a standing position while "restrained" in the RNP Sleeper, defendants transmitted that evidence to their sole outside medical advisor, Gary Deegear, M.D. Dr. Deegear responded by, recommending that defendants re-design the hard plastic foot rest area to mesh so that babies could not push up (including to a standing position) in the Sleeper even while restrained. The horrific consequence of this hazard is that once standing, the baby cannot get back down to a seated position. Whether stuck in the standing position or simply turned to its side, if the baby turns its face into the plush fabric, the baby can suffocate.

his Texas medical license in 2018.[9] Kitty Pilarz, Worldwide Director of Public Safety for defendants, testified in a RNP Sleeper infant injury case that, "I'm not sure that we did specific research at this time about incline angles other than talk to Dr. Deegear."[10]

The decision by defendants to pick approximately 30-32 degrees as the incline for the RNP was likewise not based on any testing by defendants or scientific data. Michael Steinwachs was the Engineer for Product Integrity on the RNP Sleeper's development team. He testified under oath about the research defendants conducted into the safety of the 30-degree incline, stating that he looked to the infant car seat, which cannot be angled at more than 45 degrees, "so we chose 30, which is well below 45…and so the product integrity team determined that a 30 degree angle was safe."[11] Car seat designers understand that it is unsafe for babies to sleep at such angles and explicitly warn against leaving a baby unattended or allowing prolonged sitting in a car seat. If defendants performed any safety testing related to the risks of suffocation or asphyxia before selling the RNP Sleeper as a safe overnight sleeper in 2009, they have been so far unwilling to produce such testing or data. They also refuse to admit in discovery responses that they did not perform such pre-market safety testing.

### III. Defendants Ignored Warnings of the Hazards of the RNP Sleeper During the 10 Years it was on the Market.

During the 10 year period that the RNP Sleeper was sold by defendants, the AAP remained one of the product's harshest critics, culminating on April 9, 2019 in the AAP urging the CPSC to issue an immediate recall for the RNP Sleeper, "which has been tied to 32 sleep-

---

[9] On 9/21/18, the Texas Medical Board entered a Cease and Desist Order precluding Dr. Deegear from practicing medicine in Texas. Cease and Desist Order of the Disciplinary Panel of the Texas Medical Board at https://public.tmb.state.tx.us/BoardOrders/ViewBoardOrders.aspx?ID_NUM=313253&SESSION_ID=1000510573
 See also, Degeer's expert resume at 2007 WL 759422 (M.D. Fla 2007).
[10] David Goodrich, et al. v. Fisher-Price, Inc., Deposition testimony of Kitty Pilarz, 3/21/2018, p. 47.
[11] David Goodrich, et al. v. Fisher-Price, Inc., Deposition testimony of Michael P. Steinwachs, 3/22/2018, pp. 41-42, 45-46.

related deaths…"[12]  Since that publication, there have been additional sleep-related deaths tied to the RNP Sleeper.

The AAP request for immediate recall went on to say:

> "We cannot put any more children's lives at risk by keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "The Rock 'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding."
>
> The AAP does not recommend inclined sleep products like the Rock 'n Play, or any other products for sleep that require restraining a baby. The AAP advises against using car seats, strollers or other devices for sleep because of the risk that a baby could roll or turn into an unsafe position and be incapable of moving, leading to suffocation or strangulation.[13]

In 2012, Dr. Natasha Burgert, who is now the AAP's National Spokesperson, wrote an open letter to Fisher-Price and asked that the "sleeper" be re-categorized as a "portable infant seat," cautioning that "infants in the 'sleeper' may be at risk of asphyxiation or suffocation if [it is] continued to be used as a place for overnight, unobserved infant sleep."[14]  Similarly, in 2013, Dr. Roy Benaroch—who runs the website "The Pediatric Insider"- wrote to Fisher-Price and expressed a number of concerns about the RNP Sleeper, explaining in part that "The Newborn Rock 'n Play Sleeper does not keep a baby wholly on the back, but rather in an inclined position. It is not a safe way for babies to sleep.[15]

In 2011, the Canadian and Australian governments expressly prohibited defendants from selling the RNP Sleeper as a sleeper in their countries.  In January 2011, The Australian

---

[12] AAP Urges U.S. Consumer Product Safety Commission to Recall Fisher-Price Rock 'n Play Sleeper, https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited 11/23/19).
[13] *Id.*
[14] *See* Dr. Burgert letter to Fisher-Price at https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price (last visited 11/23/19).
[15] Dr. Benaroch, The Fisher-Price Rock 'n Play Sleeper is NOT for Sleeping, at https://pediatricinsider.wordpress.com/2013/04/29/the-fisher-price-rock-n-play-sleeper-is-not-for-sleeping/ (last visited 11/23/19).

government wrote to defendants stating that marketing the RNP Sleeper as an appropriate infant sleep environment was at odds with widely accepted best practices (consistent with AAP guidelines).  In February 2011, Health Canada wrote to defendants stating that the RNP Sleeper failed to comply with recommendations by Health Canada, the Public Health Agency of Canada, and the Canadian Pediatric Society that babies should sleep on a firm and flat surface (also consistent with AAP guidelines).

### IV.     Defendants Manipulated Safety Standards for Inclined Sleepers.

Despite a decade of complaints from parents about the safety of the RNP Sleeper - including of infants standing up in the sleeper while restrained , documented reports of infant deaths and injuries, and warnings from pediatricians, the AAP, NIH, FDA , CDC, foreign government health agencies and consumer protection advocates that the RNP Sleeper was unsafe for infant sleep, defendants did nothing to modify the design of the RNP to eliminate the suffocation hazard, nor did they warn parents not to allow leave an unsupervised infant in a RNP Sleeper. Instead, defendants and their manufacturing association lobbied the CPSC to manipulate the applicable safety standards.

The Consumer Product Safety Improvement Act of 2008, § 104(b) (CPSIA) requires the CPSC to promulgate consumer safety standards for durable infant or toddler products. In April 2010, the CPSC published "Safety Standard for Bassinets and Cradles: Notice of Proposed Rulemaking with the intention of promulgating regulations that were stricter than the voluntary standard developed by the ASTM International's Standard Consumer Safety Specification for Bassinets and Cradles.  These proposed rules would have had a negative impact on defendants' ability to continue to market the RNP Sleeper as an overnight sleeper because they would have prohibited infant sleep products from having an incline exceeding 5 degrees and they would have banned restraints because "[i]nfants lying on a flat surface do not need restraints and the use of

restraints could contribute to a possible strangulation hazard.[16] The AAP commented in favor of these proposed rules.[17]

Defendants lobbied hard for three years against this proposed rule, falsely claiming in a letter to CPSC that "there has been no incident with this product indicating that it presents any risks of injuries the proposed rule aims to address [i.e., asphyxiation and suffocation]. **There certainly have been no deaths or injuries.**" (emphasis added). In October 2013, the CPSC's final rule making granted defendants a carve-out for inclined sleepers, exempting such products from the CPSC's Safety Standard for Bassinets and Cradles and deferring regulating inclined sleepers with more than a 10-degree incline to the ASTM International's subcommittee on inclined sleepers, a subcommittee that was chaired by defendants' employee, Michael Steinwachs.[18] The Chairwoman of the CPSC when this happened, Inez Tanenbaum, has since left CPSC, and has served as a product liability expert for defendants in at least one RNP Sleeper case.

If defendants chose to ignore all of the above-referenced health agencies and instead lobby for an exemption from existing safety standards, they should have to respond completely to all discovery requests regarding post- and pre-market testing, data, and expert consultation concerning whether the RNP Sleeper was safe for overnight sleep.

### V.     All Models of RNP Sleepers Were Recalled on April 12, 2018.

The CPSC's cozy relationship with defendants soured after the press uncovered the truth about the number of infants who died from use of the RNP Sleeper. In November 2018, the Wall

---

[16] https://www.federalregister.gov/documents/2010/04/28/2010-7667/safety-standard-for-bassinets-and-cradles-notice-of-proposed-rulemaking (last visited 11/23/19).

[17] *See* 7/7/2010 letter from AAP President to CPSC Chair, https://www.regulations.gov/document?D=CPSC-2010-028-0003 (last visited 11/23/19)

[18] 16 C.F.R. § 1218.2 ( "A sleep product that only has inclined sleeping surfaces (intended to be greater than 10 degrees from horizontal while in the rest position) does not fall under the scope of the standards."); and 78 FR 63019-01 ("An inclined product intended for sleeping would fall under the inclined sleep product standard currently under development by ASTM. The Commission's intent is that the scope of the bassinet standard exclude all inclined products when the incline is more than 10 degrees from horizontal.").

Street Journal reported over 30 infant deaths related to the product[19]. Prior to the WSJ article, on April 5, 2018, defendants issued a press release admitting to 10 infant deaths and warning that the RNP Sleeper should not be used once infants are able to rollover.[20] On April 8, 2019, Consumer Reports published a lengthy article entitled, *Fisher-Price Rock 'n Play Sleeper Should be Recalled, Consumer Reports Says.*[21] Despite having said for years that they were unaware of any deaths or injuries and then that they were aware of 10 deaths, defendants admitted to Consumer Reports that it knew about the 32 deaths. On April 12, 2019, defendants recalled about 4.7 million RNP Sleepers, identifying the hazard as: "**Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.**" [22] This recall included **every model** of RNP Sleeper.

The recall was too late to prevent the death of baby Overton.

## PROCEDURAL BACKGROUND

On September 16, 2019, plaintiffs served their first discovery requests on the defendants, which included forty-three (43) requests for production.[23] On October 1, 2019 defendants filed their objections, notably objecting to every single request.[24] At issue in the instant Motion are requests for information and documents related to: 1) pre- and post-market efforts to determine

---

[19] Voight, H., *Infant Deaths Prompt Questions Over Safety of Inclined Sleepers*, WSJ, Nov. 26, 2018, A-3, *See also*, Voight, H., *Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency*, Nov. 23, 2018, https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited 11/25/19).
[20] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product#
[21] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited 11/23/19).
[22] https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-rock-n-play-sleepers-due-to-reports-of-deaths (last visited 11/23/19).
[23] *See* Plaintiffs' First Interrogatories, Request for Production of Documents, Electronically Stored Information and Things and Requests for Admission to Defendants, attached as Exhibit A.
[24] *See* Defendants' Objections to Plaintiffs' First Set of Requests for Production of Documents, Electronically Store Information and Things, attached as Exhibit C.

the safety of the RNP Sleeper for all-night sleep; 2) all "other incidents" involving infant injury or death allegedly caused by a RNP Sleeper; and 3) the April 2019 recall of all RNP Sleeper models.

## ARGUMENT

Paragraphs 6 and 14 of the Joint Proposed Discovery Plan (JPDP) (Doc. 16) were negotiated in light of the fact that Plaintiffs' counsel, Ms. Hinson, was already in possession of many of the documents produced by defendants in *Goodrich v. Fisher-Price, Inc.*, et al., a case involving a July 25, 2014 positional asphyxiation incident. Notwithstanding the fact that the Judge in Goodrich had unsealed most of the documents, counsel wanted to be able to share *Goodrich* documents with consultants without fear of being accused of violating any protective order. Paragraph 14 or the JPDP contemplated counsel being able to share such documents subject to the protective orders entered in Goodrich and another infant death RNP Sleeper case, *Torres v. Fisher-Price, Inc., et al*. In the course of negotiating the JPDP and subsequent Stipulated Confidentiality and Protective Order (Doc. 20), Plaintiffs' counsel made clear that they were in no way trading their right to receive substantive discovery responses to their individual requests in exchange for an unorganized, unlabeled document dump exceeding 12,500 pages of what had previously been produced in *Goodrich* and *Torres* years earlier[25]. Unfortunately, that is precisely what plaintiffs received.

To compound the unfairness of the document dump, defendants have used Paragraph 6 of the JPDP as a sword to delay production of important documents that were not part of the original document dump. Defendants believe that any discovery request propounded by plaintiffs

---

[25] Defendants produced 1,173 documents on 10/18/19 and 826 documents on 11/6/19 all of which were produced with no attempt to organize and label them as required by Rule 34 (since they were not produced as kept in the ordinary course of business, but rather as produced in two litigation cases). See correspondence accompanying each production attached as **Exhibit H**.

that would require a response other than the *Goodrich* and *Torres* document dump is subject to endless negotiation. One glaring example is evidence of "other incidents." Although every single mode of RNP Sleeper was recalled under one recall notice due to infant deaths and although every model came under one patent and shares the same design with respect to all relevant aspects of the product, defendants object to producing evidence concerning any model other than the SnugaMonkey model RNP Sleeper in which plaintiffs' decedent died. Defendants have argued that, notwithstanding their objection, the Goodrich product (which defendants admit they would not have agreed to make in this case but for the fact that Ms. Hinson already had the documents) contains "other incident" documents. The majority of the 32 other incidents uncovered by Consumer Reports and of the over 70 deaths in inclined sleep products now reported by the CPSC occurred after the *Goodrich* incident. The *Goodrich* production does not include all of the deaths uncovered by Consumer Report or the many deaths that have come to light since the Consumer Reports expose'. Until November 27, 2019, defendants also objected to producing documents concerning and relating to the recall, other than what is already publicly available. Communications between defendants and the CPSC and non-privileged internal communications by defendants, for example, are not publicly available. Defendants finally agreed to produce these documents some time on December 5, 2019.

      Dealing with this delay tactic might be manageable in state court or in any federal district other than the Rocket Docket, but, in this case, defendants are using this tactic to prejudice plaintiffs. Plaintiffs' initial expert disclosure deadline was November 18, 2019. When plaintiffs raised the need to go to the court to seek relief from defendants' delay tactics, defendants agreed to extend the expert disclosure and discovery cut-off deadlines to **December 6, 2019** and January 30, 2020, respectively. In a meet and confer in early November, plaintiffs contend that

defendants also agreed to, among other things, a full production of "other incident" evidence – not limited to the SnugaMonkey model. This would include unredacted IDI reports, Matter Detail Reports, Case History Reports, CPSC Epidemiologic Investigation Reports in defendants' possession, and all internal documents concerning or related to other infants who were injured or died while in a Rock 'n Play sleeper (not limited to this incident or the SnugaMonkey model). Defendants now represent that they merely agreed to "consider" this request.

By November 20, 2019, defendants had not "considered" whether to produce the "other incident" evidence, which prompted plaintiffs' counsel to write to defendants requesting that they produce such materials by the close of business on November 22. On November 27, defendants represented that – among the unorganized, unlabeled document dump – they had produced other incident documents involving only fatalities about which defendants learned prior to December 22, 2017. Near-death incidents are relevant, but apparently not produced. The large number of injury and death incidents about which defendants learned after December 22, 2017, while relevant to the issue of defect, are also not produced. The defendants are dealing with similar requests in multiple other cases across the country. It is unlikely that defendants do not have every shred of "other incident" evidence already organized and labeled by incident. Nonetheless, defendants have chosen to hide the ball in this case. In recent days, defendants have switched from promising to produce all other incident materials to claiming that they already have. Defendants' November 23 letter states that:

> Defendants agree to supplement its production with the EIR reports, Matter Detail Reports and Case History Reports regarding incidents involving the Rock 'n Play Sleeper leading up to and prior to the December 22, 2017 incident at issue in this case to the extent they exist and without waiving any objections. Defendants will produce as many of these supplemental documents by Wednesday, November 27, 2019, and will supplement this production by **December 6, 2019**, as needed. [26] (emphasis added)

---

[26] *See* counsels' letters dated November 20, 2019 and November 23, 2019 in Exhibit F.

This letter was silent regarding CPSC Epidemiologic reports (EIR) in defendants' possession. These EIR reports contain the full CPSC investigation of RNP Sleeper infant death incidents and are not available on the CPSC public website.

By November 27, 2019, defendants claimed to have already produced in the document dump "all reports involving allegations of a fatality…that Defendants were aware of before the December 22, 2017 incident…."  The November 23 and 27 letters from defendants illustrate that the document dump was so intentionally disorganized that as late as November 23, defendants were not sure whether they had produced "other incident" records concerning all models of RNP Sleeper.  Moreover, defendants still have not produced such records concerning non-fatal incidents or incidents about which defendants learned after December 22, 2017.

Plaintiffs are entitled to an organized production of all "other incident " evidence, all documents regarding the recall and complete responses concerning what, if anything, defendants did or relied upon to determine whether the RNP Sleeper was safe for overnight sleep, and to a reasonable amount of time to review and analyze this information.  Defendants' actions have prejudiced plaintiffs.

## **CERTIFICATION**

Plaintiff, by counsel, attempted to confer with Defendants about this matter by telephone on November 6, 2019 and again by letter on November 20, 2019, after which plaintiffs awaited defendants' November 23 and November 27 responses.

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that the Court enter an Order requiring defendants to immediately produce without objection and in an organized and labeled fashion the following:

1. All documents concerning or regarding any and all pre-and post-market testing to determine whether the RNP Sleeper was safe for all-night sleep;

2. All documents (un-redacted) in defendants' possession, custody or control concerning "other incidents" involving infant injury or death allegedly caused by a Rock 'n Play Sleeper; and

3. All documents in defendants' possession, custody or control concerning or relating to the April 8, 2019 recall of all Rock 'n Play Sleepers.

In addition, plaintiffs respectfully request that the Court re-set the discovery plan and scheduling order in order allow plaintiffs' consulting experts sufficient time to receive and digest the above information and for such other relief as the Court deems appropriate under Rule 37.

                                                      **EVAN AMBER OVERTON AND JOHN KEENAN OVERTON, CO-ADMINISTRATORS FOR THE ESTATE OF EZRA MICHAEL OVERTON, DECEASED**

                                                      By: \_\_\_\_/s/Michael G. Phelan_____
                                                            Counsel

Michael G. Phelan, Esq. (VSB No. 29725)
Jonathan M. Petty, Esq. (VSB No. 43100)
Brielle M. Hunt, Esq. (VSB No. 87652)
PHELAN PETTY PLC
6641 West Broad Street, Ste. 406
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
jpetty@phelanpetty.com
bhunt@phelanpetty.com

Jan V. Hinson, Esq.
(SC Bar No. 101498)
(GA Bar No. 356817)
LAW OFFICES OF JAN V. HINSON, P.C.
330 East Coffee Street
Greenville, SC 29601
864-527-5933 – SC Telephone
877-797-3571 – Facsimile
11175 Cicero Drive, Suite 100
Alpharetta, Georgia 30022
678-242-5208 – Ga Telephone
jan@janhinsonlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| | |
|---|---|
| Steve Fowler, Esq. | Mary-Olga Lovett, Esq. |
| Greenberg Traurig | Greenberg Traurig, LLP |
| 2101 L Street NW, Suite 1000 | 1000 Louisiana Street, Suite 1700 |
| Washington, DC 20037 | Houston, TX 77002 |
| Email: fowlerst@gtlaw.com | |

Lori G. Cohen, Esq.
Greenberg Traurig, LLP
The Terminus
3333 Piedmont Rd NE, Ste. 2500
Atlanta, GA 30305
Email: cohenl@gtlaw.com
*Counsel for Fisher-Price, Inc. and Mattel, Inc.*

/s/ Michael G. Phelan, Esq.