IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

EVAN AMBER OVERTON AND
JOHN KEENAN OVERTON, CO-
ADMINISTRATORS FOR THE ESTATE
OF EZRA MICHAEL OVERTON,
DECEASED,

      Plaintiffs,

v.

      Case No.: 1:19-cv-751

FISHER-PRICE, INC;

AND

MATTEL, INC.

      Defendants.

## DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

COME NOW Fisher-Price, Inc. and Mattel, Inc. ("Defendants") in the above-referenced matter, and pursuant to Fed. R. Civ. P. 33 and 26 and this Court's Scheduling Order, hereby serve their Responses to Plaintiffs' First Set of Interrogatories to Defendants ("Interrogatories") as follows:

### INTRODUCTORY STATEMENT

Defendants' responses to Plaintiffs' Interrogatories are made subject to their objections previously asserted on October 1, 2019. In responding to these Interrogatories, Defendants do not adopt, embrace or accept any term or definition employed by the Plaintiffs in the Interrogatories. Defendants have made reasonable efforts to provide responses to these Interrogatories based on

**CONFIDENTIAL**

their reasonable interpretation thereof, and subject to their objections. If the Plaintiffs subsequently assert an interpretation of any of these Interrogatories which differs from that of Defendants', Defendants reserve the right to supplement their responses.

Defendants further note that the number of interrogatories, including subparts, contained within Plaintiffs' First Set of Interrogatories exceeds thirty. Accordingly, Defendants will not respond to further interrogatories from Plaintiffs absent an order of the court.

## RESPONSES TO INTERROGATORIES

1. Identify every model of Rock 'n Play and describe the differences, if any, between and among models. State in your response whether such model was ever marketed as "designed for all-night sleep," and, if so, state the time period during which said model was so marketed.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that since the Rock 'n Play Sleeper was first brought to market in 2009, through April 12, 2019 when the product was voluntarily recalled, there were approximately 120 models of the Rock 'n Play Sleeper sold in the United States. The different models have numerous differences, including but not limited to, different rocking features (e.g., manual vs. auto rock), different packaging, different soft goods fabrics, coloring, and patterns, the inclusion (or not) of a vibration feature, and the inclusion (or not) of mobile app-controlled features. Defendants are informed and believe that the Rock 'n Play Sleeper at issue in this case is the Fisher-Price® My Little Snugamonkey Special Edition Deluxe Newborn Rock 'n Play™ Sleeper, Model No. BGB20 ("the Product"), which was first sold in 2013.

[handwritten margin note: NO / See No. 4 / Same mfg. for all.]

Responding further, Defendants state that the packaging for a certain model of Rock 'n Play Sleeper depicted in Plaintiffs' Complaint contained the language "designed for all-night sleep," subject to warnings and instructions for use also provided with the Rock 'n Play Sleeper.

CONFIDENTIAL

Based on Defendants' reasonable inquiry, the packaging for the Product does not contain this language. Defendants refer Plaintiffs to the documents produced with their Initial Disclosures, and specifically the Product packaging produced in connection with Defendants' Responses to Plaintiffs' Requests for Production of Documents. Defendants reserve the right to supplement this Response as discovery is ongoing.

2. Identify all people involved in the design of the Rock 'n Play and each component and model thereof. Separately identify each person involved in any and all re-designs of the Rock 'n Play or of any component thereof.

**RESPONSE:** Subject to and not withstanding their Objections, Defendants state that the following individuals, among others, were involved in the initial design of the Rock 'n Play Sleeper: Linda Chapman (designer), Margo Moulin (soft goods engineer), Mike Steinwachs (quality engineer), and Justin Taton (product development engineer). Many others were also involved in various design features at various times in the decade since the Rock 'n Play Sleeper was sold. Defendants reserve the right to supplement this Response as discovery is ongoing.

[Handwritten margin note: "NO – Not limit response to BGB20"]

3. Did you solicit opinions, advice or consultation from any medical doctors, experts in safe infant sleep, ergonomics experts or other experts prior to marketing the Rock 'n Play? If so, identify (including area of specialty) each such person, and identify and produce all documents regarding or concerning each such person's consultation.

**RESPONSE:** Subject to and without waiving their objections, Defendants respond that Fisher-Price consulted with an independent physician, Dr. Gary Deegear, during the development of the Rock 'n Play Sleeper. Dr. Deegear was an experienced, family medicine physician, whose training is and was understood to have included pediatrics, among other areas of medicine. Dr.

[Handwritten margin note: "NO"]

**CONFIDENTIAL**

Deegear also had expertise in biomechanics, having worked as a consultant for several years at the Biodynamic Research Corporation consulting firm.

Responding further, Fisher-Price development teams, including company experts from the Quality and Engineering departments, among others, were involved in the development of the Rock 'n Play Sleeper. Fisher-Price also employed an Early Childhood Development Research team ("Child Research Team"), which included several staff members with advanced degrees in child development. The Child Research Team provided input on the Rock 'n Play Sleeper from concept to creation, on topics including child safety, ease of use, infant fit, infant positioning, and more. The Child Research Team's involvement included supervision of on-site testing with babies from the local community, prototype in-home testing with company employees, and in-home final engineering pilot testing with families in the local community. The Child Research Team supervised further in-home testing when new features were added to the Rock 'n Play Sleeper after its initial development (e.g., the vibration feature, the auto rock feature, and inclusion of animal-themed soft goods inserts).

Responding further, Defendants incorporate by reference their response to Interrogatory Nos. 5 and 6 below. Defendants reserve the right to supplement this Response as discovery is ongoing.

4.   Identify the manufacturer of the Rock 'n Play and, if different from the manufacturer, the Chinese company from whom you imported the Rock 'n Play. Include with your response the identity [sic] all people at the manufacturer and importer with whom you communicated about the design and/or manufacture of the Rock 'n Play.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that the Rock 'n Play Sleeper line of products is imported by Fisher-Price. Responding further, Imperial

*Page 4 of 17*

**CONFIDENTIAL**

[Handwritten annotations in margin: "Who?", "ID", "Did you consult? w/ whom?"]

Manufactory Limited ("Imperial") was the manufacturer of the Rock 'n Play Sleeper line of products. Defendants reserve the right to supplement this Response as discovery is ongoing.

5. Before marketing any model Rock 'n Play as "designed for all-night sleep," what, if anything, did you do to determine that the Rock 'n Play was safe for all-night sleep? Include in your answer, a detailed description of everything you did, the identity of every person upon whom you relied, a detailed description and the identity of all studies, testing and/or medical literature upon which you relied, and the identity of all persons who ultimately decided that the Rock 'n Play was safe for all-night sleep.

**RESPONSE:** Subject to and without waiving their objections, Defendants state the Rock 'n Play Sleeper was designed and marketed as a safe product when used in accordance with product instructions and warnings provided to consumers and users. At the time of its design, development, and first sale, the Rock 'n Play Sleeper complied in all respects with ASTM International Standard F2194-07 ("Standard F2194-07"), which was the cradle and bassinet standard at the time. This standard was developed by ASTM International's Committee F15 on Consumer Products, specifically Subcommittee F15.18 on Cribs, Toddler Beds, Play Yards, Bassinets, Cradles and Changing Tables, whose membership included employees of the U.S. Consumer Product Safety Commission ("CPSC"), Health Canada, the American Academy of Pediatrics ("AAP"), testing laboratories, consumer safety groups, and manufacturers. Defendants relied in part on the ASTM committee's subject matter experts who applied their collective knowledge and research to establish the various requirements and features for a safe product. Fisher-Price also thoroughly tested the Rock 'n Play Sleeper to ensure that it met or exceeded each of the requirements of Standard F2194-07. The testing included mechanical testing, testing for stability, overload, tension, and compression testing, among other types of tests. Fisher-Price also conducted

**CONFIDENTIAL**

additional tests not required by the ASTM standard such as life testing, environment testing, soft goods durability, buckle performance, and other testing.

When ASTM International first introduced a standard specific to infant inclined sleepers in 2015, ASTM International Standard F3118 ("Standard F3118-15"), Fisher-Price ensured the Rock 'n Play Sleeper complied with that standard as well.

Because Fisher-Price had been developing and producing juvenile products for decades, it had a deep bench of resources, experiences, and information that were used and relied upon in connection with developing the Rock 'n Play Sleeper. Those resources, experiences, and information included, but were not limited to, the following:

- Fisher-Price consulted with an independent physician, Dr. Gary Deegear, during the development of the Rock 'n Play Sleeper. Dr. Deegear was an experienced, family medicine physician, whose training is and was understood to have included pediatrics, among other areas of medicine. Dr. Deegear also had expertise in biomechanics, having worked as a consultant for several years at the Biodynamic Research Corporation consulting firm.

- Fisher-Price employed a Child Research Team, which included several staff members with advanced degrees in child development. The Child Research Team provided input on the Rock 'n Play Sleeper from concept to creation, on topics that included child safety, ease of use, infant fit, infant positioning, and more. The Child Research Team's involvement included supervision of extensive on-site testing with babies from the local community, prototype in-home testing with company employees, and in-home final engineering pilot testing with families in the local

CONFIDENTIAL

community. The Child Research Team supervised further in-home testing when new features were added to the Rock 'n Play Sleeper after its initial development (e.g., the vibration feature, the auto rock feature, and inclusion of animal-themed soft goods inserts).

- Fisher-Price personnel have been actively involved in ASTM International, through which they were provided access to the most recent incident data and analysis of the safety of juvenile products.

- Fisher-Price personnel have also held leadership positions with ASTM International on juvenile products, including but not limited to Catherine Pilarz (chaired subcommittee on Play Yards/Non-Full-Sized Cribs), Mike Steinwachs (chaired subcommittee on bouncers), and Joel Taft (chaired subcommittee on infant soft carriers).

- Fisher-Price personnel regularly attended safety conferences and reviewed literature on the safety of children's products.

- Catherine Pilarz: (1) is the former President of the International Consumer Products Health & Safety Organization; (2) served for many years on the Board of ASTM and served as Chairman of the Board of ASTM; and (3) attended the CPSC Roundtable on Infant Sleeping Environments in April 2009, among other things.

- The Rock 'n Play Sleeper concept was evaluated by Defendants' Safety Committee several times, which committee included several highly experienced company experts from the Quality and Engineering departments, among others.

CONFIDENTIAL

Responding further, Defendants incorporate by reference their response to Interrogatory No. 3 above and Interrogatory Nos. 6 and 10 below. Defendants reserve the right to supplement this Response as discovery is ongoing.

6. Identify each product safety committee or safety group in your company or corporate family whose function, task or responsibility at any time was to analyze, study or consider the risks or hazards of suffocation or asphyxiation relating to or concerning the Rock 'n Play. Include in your response the identity of each person on such committee or in such group and the identity, custodian and location of all documents regarding or concerning such analyses, studies or considerations.

[handwritten annotation: "ID each person"]

**RESPONSE:** Subject to and notwithstanding their objections, Defendants state that the Rock 'n Play Sleeper concept was evaluated several times by Defendants' Safety Committee, which has included several highly experienced company experts from the Quality and Engineering departments, among others.

Members of Fisher-Price's Product Safety and Regulatory Compliance team (the "Product Safety Team") also analyze incident data, participate in standards-setting bodies, review literature on safety issues, and are involved in the product development process to spot safety issues. Members of the quality engineering team draft the internal product requirements documents ("PRDs") and members of the Product Safety Team draft the quality and safety operating procedures ("QSOPs"), which cover all aspects of product development and safety. The Product Safety Team is further responsible for reporting data to regulators, such as the CPSC, managing product recalls, and monitoring regulations worldwide to ensure Defendants meet all applicable standards and requirements that could affect their products.

Responding further, Defendants refer Plaintiffs to the documents produced with Defendants' initial disclosures and to documents produced with Defendants' Responses to

**CONFIDENTIAL**

Plaintiffs' Request for Production of Documents, including but not limited to, the hazard analysis and safety audit reports related to the Rock 'n Play Sleeper (including the identity of those who attended Safety Committee meeting(s)), the PRD for the Product, and the QSOPs applicable to the Product.

Responding further, Defendants incorporate by reference their response to Interrogatory Nos. 3 and 5 above. Defendants reserve the right to supplement this Response as discovery is ongoing.

7.  What is the angle of incline of the SnugaMonkey when the product is at rest?

**RESPONSE:** Subject to and notwithstanding their objections, Defendants state that the angle of incline of the Product does not exceed 30 degrees from the horizontal when measured pursuant to the procedure described in Standard F3118-15.

[handwritten margin note: "BS objection / known term of art"]

8.  Please describe in detail the circumstances and location of and the reasons for all instances in which you or anyone on your behalf videotaped and/or photographed a baby or infant in a Rock 'n Play. As part of your response, identify all persons present during the videotaping and/or photographing of each such baby; describe all tests that were conducted in association with the videotaping of each such baby or infant; identify all babies who were videotaped and/or photographed; state whether any baby or infant was captured on video or photographed standing while restrained; and identify and produce all documents concerning or related to such videotaping, photographing and testing.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that pursuant to Federal Rule of Civil Procedure 33(d), they will produce copies of all testing-related videotapes and photographs of infants in Rock 'n Play Sleepers in their possession, custody, or control, and that can be located following a reasonable search and diligent inquiry.

[handwritten margin note: "NW"]

Defendants reserve the right to supplement this Response as discovery is ongoing.

**CONFIDENTIAL**

9. Identify by name of victim, name of victim's caregiver(s), date of occurrence, model of Rock 'n Play, style of legal case, venue where legal case filed, and name of Plaintiff's counsel every injury or death involving suffocation or asphyxiation while in a Rock 'n Play sleeper. In addition, please identify all documents in your possession or control concerning or regarding each such occurrence.

**RESPONSE:** Subject to and without waiving their objections, including, but not limited to their objection that this Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in that Plaintiffs have not limited the scope of this interrogatory to the Product at issue, or time period relevant to this cause of action, or to lawsuits filed, Defendants state that the following individual lawsuits related to the Rock 'n Play Sleeper have been filed and served:

| Concluded Lawsuits: | | |
|---|---|---|
| **Case Caption** | **Venue** | **Date Filed** |
| *Torres, et al. v. Imperial Manufactory Ltd., et al.*, 7:2015-cv-00444 | United States District Court for the Southern District of Texas | October 23, 2015 |
| *David Goodrich, et al vs. Fisher-Price, Inc.*, 1:2016-cv-03116 | United States District Court for the Northern District of Georgia | August 24, 2016 |
| **Pending Lawsuits:** | | |
| **Case Caption** | **Venue** | **Date Filed** |
| *Kathleen Courkamp, et al v. Fisher-Price, Inc., et al.* | United States District Court for the District of Arizona | April 26, 2019 |
| *Amanda L. Butler, et al. v. Fisher-Price, Inc., et al.* | Superior Court, Los Angeles County, California | June 12, 2019 |
| *Carrie Sanders, et al. v. Fisher-Price, Inc., et al* | Superior Court, Los Angeles County, California | July 12, 2019 |
| *Christopher W. Harris, et al., v. Fisher-Price Inc et al.* | United States District Court for the Western District of Louisiana | August 8, 2019 |
| *Manda Jackson and David Myers v. Fisher-Price, Inc. and Mattel, Inc.* | Circuit Court for Cocke County, Tennessee | August 9, 2019 |
| *Erin Booth and Jeffery Booth, Individually and as Representatives of The Estate of J.R.B., Deceased, v. Fisher-Price, Inc., Mattel, Inc.* | United States District Court for the Northern District of Oklahoma | September 30, 2019 |

**CONFIDENTIAL**

| *Jaclyn Kelley, individually, and Joshua Kelley, Individually, and as Personal Representative of the Estate of A.K v. Fisher-Price Inc., Mattel, Inc., and Amy Renee Williams a/k/a Amy Morin* | In the Judicial District of Nueces County, Texas | October 14, 2019 |
|---|---|---|
| *James Weigand, Jr. v. Fisher-Price, Inc. and Mattel, Inc.* | In the State of New York, Supreme Court: County of Erie | October 10, 2019 |

Responding further, Defendants deny that the Rock 'n Play Sleeper caused any of the injuries claimed in these other cases, including injuries of asphyxiation or suffocation. This Interrogatory seeks information regarding other alleged incidents that are wholly unrelated to the incident in this case. By responding to this Interrogatory, Defendants do not waive, but rather expressly reserve, their objections previously asserted on October 1, 2019, including their objection to the admissibility of any information related to or produced in other lawsuits.

10.   Identify all standards, laws and regulations that you contend apply to the design of and warnings on Rock 'n Play sleepers.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that when first released, the Rock 'n Play Sleeper satisfied all company quality and safety standards, as well as ASTM Standard F2194-07, and any applicable CPSC standards, including Section 104(b) of the Consumer Product Safety Improvement Act. ASTM eventually developed a new standard specific to infant inclined sleeper products, and Standard F3118-15 was adopted in 2015 to specifically provide standards for infant inclined sleeper products. Once Standard F3118-15 was adopted, the Rock 'n Play Sleeper satisfied all requirements therein. The Rock 'n Play Sleeper

**CONFIDENTIAL**

was also certified by the Juvenile Products Manufacturers Association as meeting applicable government requirements for safety and use.

In addition, certain federal regulations apply to the Rock 'n Play Sleeper and other children's products, including but not limited to 16 CFR part 1303 (lead paint), part 1500 (sharp points/edges), and part 1501 (small parts). The PRD for the Product contains reference to each of the standards applicable to the Product, all of which the Rock 'n Play Sleeper met or exceeded.

Responding further, Defendants utilize internal standards known as QSOPs, which govern all engineering and technical specifications of the Product (such as, for example, the materials used in the Product, and the buckle on the Product's restraint system). The QSOPs applicable to the Product are identified on the PRD for the Product included in Defendants' document production. The design of the Rock 'n Play Sleeper at all times met or exceeded all applicable standards and regulations.

Responding further, Defendants incorporate by reference their response to Interrogatory Nos. 5 and 6 above. Defendants reserve the right to supplement this Response as discovery is ongoing.


11. Reproduce or produce all statements by or on behalf of Plaintiffs concerning the incident, Ezra and/or Ezra's sleeper. Objection will be made at trial to any such statement not produced.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that they have in their possession, custody, or control only those statements made by Plaintiffs directly to Fisher-Price. Defendants will produce documents sufficient to show their records of statements made by Plaintiffs directly to Fisher-Price.

Defendants are aware that Plaintiffs made additional statements to the investigating police officers and detectives. Portions of those statements are contained in the police investigation report related to the incident described in the Complaint; however, Defendants do not have a complete copy of that report at this time. Defendants refer Plaintiffs to the Epidemiologic Investigation Report from CPSC for the Overton incident (the "IDI report") on this incident which contains what appears to be an incomplete copy of the police investigation report.

Defendants are further aware that Plaintiffs have made statements to certain media outlets in interviews and other published statements. Defendants reserve the right to supplement this Response as discovery is ongoing.

12. With regard to the April 5, 2019 alert concerning and regarding Rock 'n Play sleepers, please identify each author of the following statement contained in the alert - "According to medical literature, infants typically begin rollover behaviors at 3 months" — and identify by authors, title and publication all medical literature relied upon for that statement.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that the quoted statement in the April 5, 2019 CPSC Alert was drafted by the CPSC. Defendants therefore do not know who the author(s) of the statement is(are). Defendants reserve the right to supplement this Response as discovery is ongoing.

13. Describe in detail all reasons for The Recall, and identify all persons who made the decision to recall the Rock 'n Play and all documents forming the grounds for the decision to recall the Rock 'n Play.

**RESPONSE:** Subject to and without waiving their objections, Defendants state that the voluntary recall of the Rock 'n Play Sleeper, which was completed in partnership with the CPSC,

**CONFIDENTIAL**

was due to reported incidents of infant fatalities that occurred in Rock 'n Play Sleepers after the infants rolled over while unrestrained, or under other circumstances.

Responding further, Defendants state that the decision to voluntarily recall the Rock 'n Play Sleeper was made by Defendants in partnership with the CPSC. Defendants reserve the right to supplement this Response as discovery is ongoing.

14. State in detail all facts and identify all persons, documents and things upon which you rely for each of your Affirmative Defenses.

**RESPONSE:** Subject to and without waiving their objections and without waiving the attorney-client privilege and the work product doctrine, Defendants state that the Product is safe when used in accordance with Product instructions and warnings provided to consumers and users and the Product at all relevant times complied with all applicable regulations, laws and standards. The instructions and warnings for the Product also at all relevant times complied with all applicable regulations, laws and standards.

At this early stage in this litigation, information from allegations contained in Plaintiffs' Complaint and contained in the IDI report related to the incident provide the primary factual basis with regard to the affirmative defenses pled in Defendants' Answer to Plaintiffs' Complaint.

In addition, information contained in documents produced with Defendants' Rule 26 Initial Disclosures provide the basis, both factual and legal, to the defenses to Plaintiffs' Complaint. Specifically, Defendants contend that that the Product is safe as designed and when used in accordance with the warnings and instructions, and that the Product did not cause or contribute to the death of E.O. The alleged incident appears to have been caused by

independent, intervening, and/or superseding events, acts, pre-existing conditions, or omissions for which Defendants are not legally responsible. Furthermore, the incident may have been caused by unforeseeable misuse, abuse, abnormal use, user error, alterations, changes, and/or modifications of the Product described in Plaintiffs' Complaint for which Defendants were and are in no way liable. Responding further, Defendants incorporate by reference their response to Interrogatory No. 15 below. Defendants reserve the right to supplement this Response as discovery is ongoing.

15. Describe in detail, in narrative form, the cause of the incident, stating all facts and identifying all witnesses, documents or things upon which you rely to answer this Interrogatory.

**RESPONSE:** Subject to and without waiving their objections and without waiving the attorney-client privilege and work product doctrine, Defendants state that the Product is safe when used in accordance with product instructions and warnings provided to consumers and users and the Product at all relevant times complied with all applicable regulations, laws and standards. The instructions and warnings for the Product also at all relevant times complied with all applicable regulations, laws and standards.

At this early state in this litigation, information from allegations contained in Plaintiffs' Complaint and contained in the IDI report related to the incident provide the primary factual basis for determining the cause of the incident.

Defendants state they do not have sufficient information at this time to determine "all facts" and "all witnesses, documents and things" with regard to the cause of the incident as discovery is continuing. Defendants state the Product did not cause or contribute to the accident alleged in the Complaint. Responding further, information related to the cause of the incident

**CONFIDENTIAL**

may be contained in the police investigation report and the Medical Examiner's report. (Defendants do not have a complete copy of the police report in their possession at this time, nor do they have a copy of the Medical Examiner's report.) Defendants further state that the cause of the incident will be the subject of expert testimony.

Responding further, Defendants incorporate by reference their response to Interrogatory No. 14 above. Defendants reserve the right to supplement this Response as discovery is ongoing.

Dated: October 24, 2019

Respectfully submitted,

*/s/ Stephen T. Fowler*
Stephen Fowler (VSB 44071)
**GREENBERG TRAURIG, LLP**
2101 L Street N.W., Suite 1000
Washington, D.C. 20037
Telephone: (202) 530-8587
Facsimile: (202) 261-0462
Email: fowlerst@gtlaw.com

Lori G. Cohen (*pro hac vice pending*)
**GREENBERG TRAURIG, LLP**
The Terminus
3333 Piedmont Road, N.E.
Suite 2500
Atlanta, GA 30305
Tel.: (678) 553-2100
Fax: (678) 553-2212
Email: cohenl@gtlaw.com

Mary-Olga Lovett (*pro hac vice pending*)
**GREENBERG TRAURIG, LLP**
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3541
Facsimile: (713) 754-7541
Email: lovettm@gtlaw.com

*Attorneys for Mattel, Inc. and Fisher-Price, Inc*

Page 16 of 17

**CONFIDENTIAL**

## VERIFICATION

I, Chuck Scothon, certify that:

1. I am an authorized representative of Defendants Fisher-Price, Inc. and Mattel, Inc.;

2. I have read Defendants' Responses to Plaintiffs' First Set of Interrogatories; and

3. The contents are accurate as of this time to the best of my knowledge, information and belief formed after a reasonable inquiry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have read this Verification and it is true and correct, subject to the following limitation. To the extent that certain factual matters stated in Defendants' Responses to Plaintiffs' First Set of Interrogatories are not within my personal knowledge, the information has been assembled by authorized representatives of employees of the Defendants herein. As to any such matters, I am informed and believe them to be true and correct based upon information and belief.

Executed this 24th day of October, 2019

BY: [signature]

TITLE:

SVP, GM Fisher-Price and Global Head of Infant & Preschool

*On behalf of Defendants Mattel, Inc. and Fisher-Price, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2019, I served by email and First Class mail the foregoing Responses to Plaintiffs' Interrogatories to the following:

Michael G. Phelan, Esq.
Jonathan M. Petty, Esq.
Brielle M. Hunt, Esq.
PHELAN PETTY, PLC
6641 West Broad Street, Ste 406
Richmond, VA 23230
(Tel) 804-980-7100
(Fax) 804-767-4601
mphelan@phelanpetty.com
jpetty@phelanpetty.com
bhunt@phelanpetty.com

Jan V. Hinson, Esq.
LAW OFFICES OF JAN V. HINSON, P.C.
330 East Coffee Street
Greenville, SC 29601
(tel) 864-527-5933
(Fax) 877-7973571
jan@janhinsonlaw.com

*Attorneys for Plaintiffs*

*/s/ Stephen T. Fowler*
Stephen T. Fowler, Greenberg Traurig, LLP

**CONFIDENTIAL**