UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

EVAN AMBER OVERTON and    .    Civil Action No. 1:19cv751
JOHN KEENAN OVERTON,      .
Co-Administrators for the .
Estate of Ezra Michael    .
Overton,                  .
                          .
            Plaintiffs,   .
                          .
     vs.                  .    Alexandria, Virginia
                          .    December 13, 2019
FISHER-PRICE, INC., and   .    10:11 a.m.
MATTEL, INC.,             .
                          .
            Defendants.   .
                          .
.  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:          MICHAEL G. PHELAN, ESQ.
                             Phelan Petty, PLC
                             6641 West Broad Street, Suite 406
                             Richmond, VA 23230
                               and
                             JAN V. HINSON, ESQ.
                             Law Offices of Jan V.
                             Hinson, P.C.
                             11175 Cicero Drive, Suite 100
                             Alpharetta, GA 30022


FOR THE DEFENDANTS:          STEPHEN T. FOWLER, ESQ.
                             Greenberg Traurig, LLP
                             2101 L Street, N.W., Suite 1000
                             Washington, D.C. 20037

(APPEARANCES CONT'D. ON PAGE 2)

(Pages 1 - 39)

(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANTS:              LORI G. COHEN, ESQ.
                                     Greenberg Traurig, LLP
3                                    The Terminus
                                     3333 Piedmont Road, N.E.
4                                    Suite 2500
                                     Atlanta, GA 30305
5
     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
6                                    U.S. District Court, Third Floor
                                     401 Courthouse Square
7                                    Alexandria, VA 22314
                                     (703)299-8595
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2               THE CLERK:  Overton, et al., versus Fisher-Price,

3    Inc., et al., Case 19cv751.  Counsel, please note your

4    appearances for the record.

5               MR. PHELAN:  Good morning, Your Honor.

6               THE COURT:  Good morning.

7               MR. PHELAN:  I'm Michael Phelan for the plaintiff,

8    and this is my cocounsel, Jan Hinson.

9               THE COURT:  Good morning.

10              MS. HINSON:  Good morning, Your Honor.

11              MR. FOWLER:  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MR. FOWLER:  Stephen Fowler on behalf of Mattel,

14   Inc., and Fisher-Price, Inc.

15              THE COURT:  All right.

16              MR. FOWLER:  And with me is Lori Cohen.

17              THE COURT:  Good morning.

18              MS. COHEN:  Good morning, Your Honor.

19              THE COURT:  All right, this is on the plaintiffs'

20   motion to compel.  Do you have anything to add to your motion?

21   I've read all the pleadings.

22              MR. PHELAN:  I do.  We've had some discussions, and I

23   think some clarification may help the Court.

24              THE COURT:  Okay.  Good.

25              MR. PHELAN:  If I could, I'd like to hand up some

1  documents that help illustrate the point and the dispute, but I

2  would also like to point out that when we filed the motion, we

3  had not yet disclosed designated experts and have been able to

4  do so since, so we are going to withdraw the request for an

5  extension of the discovery deadline --

6      THE COURT:  Okay.  Good.

7      MR. PHELAN:  -- and strictly focus on some specific

8  discovery responses.

9      THE COURT:  Okay.

10     MR. PHELAN:  And if I may, with the Court's

11 permission, just hand up some documents that I think help

12 illustrate the dispute?

13     THE COURT:  I did have one question.  Did you -- did

14 the discovery responses not have any reference to Bate

15 numbers -- Bates numbers?

16     MR. PHELAN:  They had broad-range references, you

17 know, from this page to this page, thousands of pages.

18     THE COURT:  Okay.

19     MR. PHELAN:  But, but what was produced were, you

20 know, you open up the link and it's hundreds of PDFs,

21 uncategorized, unlabeled, that have to be opened and read to

22 even know what the documents are.

23     THE COURT:  Okay.

24     MR. PHELAN:  And they're not -- they were not batched

25 together, you know, in, in a fashion that --

1          THE COURT:  Was it a combination of documents within

2   there?

3          MR. PHELAN:  Yes.

4          THE COURT:  For instance -- okay.

5          MR. PHELAN:  Yes.

6          THE COURT:  All right.

7          MR. PHELAN:  Yes.

8          So, Your Honor, the -- what I handed up is, the first

9   two photographs sort of explain the theme of the case, and so

10  this, this rocker that I know you're familiar with because

11  you've read everything --

12         THE COURT:  I've read about the child being able to

13  stand.

14         MR. PHELAN:  Yeah.

15         THE COURT:  Is that what the first photo is?

16         MR. PHELAN:  Yes.  So this is -- this shows a child

17  standing while buckled.

18         THE COURT:  Right.

19         MR. PHELAN:  And you can see there's no shoulder

20  strap, and, and infants have this primitive reflex where if you

21  push on the bottom of their feet, they're going to push up even

22  if they're not old enough to stand, and so that's what we

23  allege happened in this case.

24         And that -- and the next photograph is actually a

25  still photo of a video experiment conducted by the defendants

1   in another case in which this child just stood up during,

2   during the experiment, and that child is buckled as well.

3           And the reason that's relevant is because in their

4   30(b)(6) depositions in another case, the defendants deny that

5   it's possible for a child to even roll over, let alone stand

6   up, while restrained.  And indeed, their recall notice kind of

7   blames the parents, saying that these -- we're recalling this

8   because of fatalities that occur when, when children roll over

9   while unrestrained and, and under other circumstances.  That's,

10  that's how they recalled this product.

11          And so if they're going to claim that it's impossible

12  for a restrained child to stand up or roll over, then we think

13  it's discoverable whether they have information that this was

14  going on and did they test about it, etc., and did they have

15  notice about it when -- even after the date of our incidents,

16  because if they're going to say it's impossible, then evidence

17  that it happened, regardless of when, is at least discoverable

18  and arguably admissible.  So that's the foundation, I think,

19  for our argument.

20          And I would like to turn my attention to the joint

21  discovery plan because there was a lot of conversation about

22  that in the opposition, and before I do that, I'll say that the

23  defendants in other cases, if you look at the next set of

24  documents, there's a letter on Nelson Mullins letterhead, so in

25  other cases, they've conceded that there's many, many, many

1    models of this Rock 'n Play Sleeper, but --

2           THE COURT:  But as I understand it, they hardly had

3    any changes.

4           MR. PHELAN:  That's right.  It's just a difference in

5    appearance of the cloth insert.  You know, some of them had

6    monkey faces, some had lamb faces, some had no, no animal theme

7    whatsoever, but the relevant design, as is stated in this

8    letter, hasn't changed since 2009.  Remained the same since its

9    first production in 2009.

10          The reason I bring that up, and they actually in the

11   next document, they put that into a sworn discovery response,

12   is because one of the major meet-and-confer issues that we had

13   to spend a lot of time on in this case was the defendants

14   wanted to define the Rock 'n Play as just the SnugaMonkey model

15   because that's what our child died in, and initially they, they

16   were going to only produce, you know, or only produce without

17   objection documents about the SnugaMonkey, and we had to talk

18   about that, you know, at length and wait and wait and wait on

19   their consideration of that, and, you know, it's just -- it

20   just delayed, delayed, delayed.

21          You can see from the -- I'm not going to belabor the

22   point, but the photographs that follow are the SnugaMonkey and

23   every other model, and you can see that there -- there's no

24   difference other than the insert, fabric insert.

25          So, you know, we took a lot of criticism, I think, in

1   the opposition about this joint proposed discovery plan, and

2   what was not mentioned in that opposition is paragraph 4 of the

3   joint -- well, let me back up.

4           I think the -- I think if the Court only read the

5   opposition, the Court would be under the impression that all

6   the defendants were required to do was reproduce documents from

7   these two other cases, *Goodrich* and *Torres*, which they claim

8   Ms. Hinson already had, as if we would agree that that was our

9   discovery plan, you just gave us what we already have.  That's

10  how the opposition reads.

11          And the, and the -- it's interesting to note that the

12  *Goodrich* incident happened July 24, 2014, and the *Torres*

13  incident happened October 19, 2013.  So we -- obviously,

14  there's a whole bunch of relevant information that extends

15  beyond *Goodrich* and *Torres*, and the discovery plan says that

16  and notes that.  And indeed, in paragraph 4 of the discovery

17  plan, it says the parties will conduct discovery on the

18  subjects raised in the pleadings.

19          Well, our complaint was very, very extensive.  It

20  talked all about other incidents, giving notice.  It talked

21  about the recall, and it talked about how there was absolutely

22  no clinical testing done by defendants before they released

23  this product onto the market, and went into the detail about

24  the one doctor that they, they even consulted, who was not a

25  pediatrician and has since lost his medical license.

1          The, the, the joint discovery plan contemplates

2     interrogatories.  It, it, it talks about requests for

3     production being done pursuant to Rule 34, and then in addition

4     to -- it says specifically in paragraph 6:  In addition to the

5     *Goodrich* and *Torres* production, the plaintiffs can request

6     updated production which will be discussed in good faith, and

7     it contemplates what I discussed earlier.  There are going to

8     be -- there are going to be responses to our requests that

9     couldn't have been covered by *Goodrich* and Torres, and, and

10    this discovery plan, which was dated 9/25/19, specifically

11    says, quote, such as requests for documents concerning the

12    recall.

13         So we were talking about getting documents concerning

14    the recall and getting other incident documents back in

15    September, and, you know, I had to send a letter on November 20

16    to say:  What's going on here?

17         And the response -- because, you know, in the letter,

18    I say:  We agreed you'd produce these things.

19         And the response was:  No, we agreed to consider it.

20         So between that and this global objection that only

21    the model, the SnugaMonkey model is relevant, you know, that's,

22    that's, that's the reason for, in my opinion, the delay.

23         So here's what we seek specifically today.  And we've

24    tried to narrowly tailor this.

25              THE COURT:  Okay.

1      MR. PHELAN:  And after I outline the categories, I'll

2  get to the specific requests.  Other incident information, and

3  I'm going to talk about pre-Ezra Overton's incident, which was

4  December 22, 2017, and post.  Pre, in discussions with counsel,

5  we believe they produced all fatalities.  I think they should

6  also produce nonfatal incidents involving near asphyxiation or

7  suffocation.

8      There are a lot of incidents out there where there is

9  a mold problem in this product, and, you know, we don't need to

10  see the mold documents, but if a child was in the chair and was

11  suffocating or asphyxiating, turning blue, and the mom got her

12  just in time, that's still relevant.

13      THE COURT:  Okay.

14      MR. PHELAN:  And counsel indicates they think that

15  they actually have produced that, even though their responses

16  say they're limiting it to fatalities, and if that's the case,

17  they just need to say so.

18      THE COURT:  Okay.

19      MR. PHELAN:  I just want -- I want the answer to be

20  clear what we have and what they're agreeing to produce.

21      Post-Ezra Overton incidents, I think I've already

22  explained why I think they're relevant, because their 30(b)(6)

23  expert testified under oath that if it's -- if the child's

24  restrained, it's not possible for the child to stand in the

25  chair, and --

1          THE COURT:  Well, now you talked about that in

2    connection with the testing, but why would other incidents

3    post-Overton --

4          MR. PHELAN:  Well, because if another child was found

5    standing and restrained in the chair --

6          THE COURT:  Okay.

7          MR. PHELAN:  -- and it was -- and it's in the form of

8    an incident report even from the CPSC or internal --

9          THE COURT:  Okay.

10          MR. PHELAN:  -- then it proves that it's possible.

11          THE COURT:  All right.

12          MR. PHELAN:  Okay?  So that's the first category.

13    The second category is the recall information.

14          THE COURT:  Right.

15          MR. PHELAN:  And what we got was basically anything

16    you could get publicly plus a form letter that they sent to all

17    the retailers, and those pictures of each model that I've

18    showed you are actually safety alerts that were put on the

19    internet.

20          What we don't have and what we're asking for are

21    communications between defendants and CPSC leading up to there

22    was a safety alert the week before the recall and then there

23    was the recall, and we want those documents.

24          And again, as reflected in the joint discovery plan,

25    it was contemplated that we wanted those documents early on,

1   and what I'm hearing is, well, that would require an ESI search

2   to separate out the CPSC communications involving this product

3   as opposed to other products, etc., and, you know, I hear that,

4   but my -- I think my -- I think my reaction is that search

5   should have been conducted at least the day after the joint

6   discovery plan was entered into, because it's contemplated in

7   the discovery plan, but probably sooner.  So, so that's the

8   recall information.

9           THE COURT:  Okay.

10          MR. PHELAN:  I would point out that whether it's

11  discoverable is different than whether it's admissible --

12          THE COURT:  Right.

13          MR. PHELAN:  -- and there's all kinds of things the

14  CPSC invites the manufacturer to produce to them in response to

15  a, hey, we're going to put out this safety alert or recall

16  notice in 24 hours; send us what you want.

17          We want to know what they sent them.

18          THE COURT:  Okay.

19          MR. PHELAN:  And maybe it's nothing, but that should

20  be the answer, okay?

21          And then finally, the third topic is this -- the

22  product was, you know, the quote on the packaging of this

23  product was "designed for all-night sleep."  It was the first

24  product on the market that was designed for all-night sleep,

25  where the child was going to sleep at a 30 or greater degree

1    incline angle, and the only thing talking about safe sleep in

2    the '90s, when this came out, was the AAP and other health

3    organizations which say the only safe sleep is for a baby to

4    sleep flat on a horizontal surface, on its back, with nothing

5    else in the bed, no fluffy monkey ears around the face or

6    anything like that, because that's a suffocation hazard.

7         So basically our -- we have a series of requests that

8    say if you designed this for safe, for safe all-night sleep,

9    tell us what you did to determine that it was safe to sleep in

10   this thing.

11        And we have a series of objections, including it's

12   not relevant and it's not proportionate, you know, and we

13   should only be talking about one model, and then we have some

14   responses that include things like, well, we -- we're all very

15   highly educated here at Fisher-Price in health, and we go to

16   safety conventions and things like that.

17        That's not -- the problem is their -- again, their

18   30(b)(6) witnesses in other cases have basically said, we did

19   no clinical testing.  We, we consulted exactly one doctor, who

20   was not a pediatrician, who was a -- who practiced medicine for

21   a couple of years and then became a professional expert in

22   cases like, you know, some guy had a pal in his car and was

23   injured and some product liability cases.

24        So if that's all they did, they just need to say it

25   instead of here's the 5,000 things that aren't responsive to

1    our question.

2              THE COURT:  Okay.

3              MR. PHELAN:  So let me just point out that -- I'm

4    trying -- I'm trying to narrowly tailor this so that we're not

5    just talking in abstract.  Under the requests for production,

6    which are the last -- the last stack of documents are the

7    requests, the objections followed by the actual responses.  The

8    requests for productions, if you look at the objections, this

9    is the page that says 1 of 21, the introductory objection is

10   what I've been talking about.  They're trying to limit --

11             THE COURT:  Right.

12             MR. PHELAN:  -- everything to the BGB20 model.

13             So then with that in mind, I want to talk about

14   requests 10 through 12, which are essentially the, all

15   documents relied upon prior to first selling the Rock 'n Play

16   for the proposition that these sleepers were safe for all-night

17   sleep.  It's -- but, you know, I think the objection should be

18   overruled.  It's absolutely relevant to this case.

19             No. 10.  And specific, if there are any, you know,

20   documents relied upon should be identified, labeled, and

21   categorized as required by Rule 34, not just a response of see

22   our multiple thousands of documents.  It's in there somewhere.

23             THE COURT:  Okay.

24             MR. PHELAN:  Same, same thing with 11 and 12.  It's

25   the same category.

1          Then, then request No. 13 is the one that deals with

2   the other incidents.

3          THE COURT:  Right.

4          MR. PHELAN:  We've talked about that.  And then

5   Nos. 16, 17, and 23 cover the issue of relating to an infant

6   being able to push up into the sleeper, also highly relevant.

7   I think that objections should be overruled and there should be

8   fulsome responses.  There is to one of them.  It says, "None."

9          THE COURT:  Right.  That's in 16.

10          MR. PHELAN:  But that -- if I may point out, that

11   answer is only accurate if the objection stands, because the,

12   the photograph I showed you of the experiment --

13          THE COURT:  Right.

14          MR. PHELAN:  -- happened after our incident, so

15   they're saying subject to the objection, there are none.

16          THE COURT:  Okay.

17          MR. PHELAN:  There are some.  They just were after

18   our incident.

19          No. 18 is also a safety question, and it deals with

20   the strap, which they refer to as the crotch strap.  And again,

21   if that's the only restraint and you're not putting a strap

22   over the child's shoulders, the child can scoot up in this

23   thing.

24          And the strap's not -- by the way, the strap's not

25   even affixed to the hard plastic exterior.  It's looped through

1  the material.  So it rides up.

2          We think we should be -- we should know whether there

3  was any safety or efficacy research or studies or testing with

4  respect to that strap.

5          And then just -- you know, just to point out how

6  little sense this global objection makes, we, we say in

7  requests No. 19 through 20, well, give us the testing you did

8  specific to the SnugaMonkey and the other animal face models,

9  and again that's objected to.  I think those should be

10  overruled, and there should be specific, categorized, labeled

11  responses to that because not every model came out in the same

12  year.  And maybe, you know, maybe they did some testing in 2013

13  that they didn't do in 1990.  We should know that.

14          Finally, No. 21 is, is the one that covers the

15  recall.

16          THE COURT:  Okay.

17          MR. PHELAN:  And then I have -- I'm sorry to be

18  taking so long.

19          THE COURT:  That's all right.

20          MR. PHELAN:  I just have three interrogatories that

21  I'd like to discuss.

22          THE COURT:  Okay.

23          MR. PHELAN:  And that is the next set of documents,

24  starting with the objections.  There -- you have the same

25  global objection to the interrogatories that we asked be

1   overruled in the introductory statement.

2           And then the next interrogatory I'd like to discuss

3   is No. 5, which is on page --

4           THE COURT:  5.  I've got it.

5           MR. PHELAN:  5.  And this essentially gets to the

6   issue of you designed it for all-night sleep.  What, if

7   anything, did you do to determine if it was safe for all-night

8   sleep?

9           We ask that the objection be overruled, and, you

10  know, I've mentioned, I've mentioned the testimony by the

11  30(b)(6) people, but I can't articulate it any better than *The*

12  *Washington Post* did in May, May of this year.  This is brief.

13  They said it was 2009, Fisher-Price's invention was an incline

14  sleeper.  They named it the Rock 'n Play, held babies on their

15  back in a padded frame at a 30-degree angle like a recliner.

16  There was nothing else like it.  Cribs and bassinets lie flat.

17  The difference was spelled out right on the box, baby can sleep

18  at a comfortable incline all night long, but Fisher-Price

19  developed its revolutionary product based on faulty beliefs

20  about infants' sleep, with no clinical research into whether it

21  was safe, and rather than seeking the advice of pediatricians,

22  consulted just a single doctor, a family physician from Texas

23  whose expertise had already been doubted by judges and who

24  would eventually lose his medical license.

25           In, in fact, the first time Fisher-Price hired a

1    pediatrician to evaluate the Rock 'n Play was eight years later

2    as part of the company's defense in a product liability

3    lawsuit.

4           So we're asking that the objection be overruled, and

5    if the answer is, we didn't do anything, then that should be

6    the answer.  If -- instead, if you read the answer, it is a

7    litany of evasions that talk about things like I mentioned.

8           THE COURT:  Right.

9           MR. PHELAN:  We've gone to conventions.  We have

10   people who are educated on our staff.  You know, we've looked

11   at some standards.

12          There were no standards because this was the first

13   product of its kind when it came out.  The standards did not

14   address the safety of sleeping at an incline.  The only

15   standard that addressed inclined sleepers came out years later

16   and was written by Fisher-Price's Rule 30(b)(6) witness.

17          But at the time -- the question has to do with at the

18   time you developed the product and represented it to be safe

19   for all-night sleep, what did you -- what did you rely on for

20   that representation, and I don't think that is answered.  We

21   ought to, we ought to, we ought to hear from them that they

22   didn't do clinical testing.

23          THE COURT:  Okay.  All right, thank you.

24          MR. PHELAN:  So No. -- the next one is No. 6.  We're

25   asking for the identity of the people on the product safety

1  committee. We've got the names of the committees given but no

2  people. We ask that the objection be overruled and that

3  everyone be identified who was on the committee that developed

4  this product.

5       And then No. 8 is one that I -- one of the reasons I

6  wanted the Court to hear from me, because we've had a

7  discussion about No. 8 out in the hall. The, the answer to

8  No. 8, asking for a description of, of all instances in which

9  they videotaped or photographed a baby in a Rock 'n Play, was

10  subject, of course, to the objection which we ask be overruled,

11  they will produce copies of all testing-related videotapes and

12  photographs in their possession after a reasonable search.

13       We've never received in the Overton case any

14  production of any such video or photograph. In the hall,

15  counsel advised me, well, the only ones we have are the ones

16  that were produced in previous cases, which we understand that

17  you already have, which is true if that -- if that's all they

18  have, and I would just ask that -- and I think we have an

19  agreement and don't require a ruling -- that they, they

20  supplement the response to say so.

21       THE COURT: Okay.

22       MR. PHELAN: Because the way this reads is there are

23  others that they're going to produce in the future.

24       THE COURT: All right, thank you.

25       MR. PHELAN: And I think we've worked that out.

1        THE COURT:  Okay.

2        MR. PHELAN:  So that's it.

3        THE COURT:  Thank you.

4        MR. PHELAN:  Thank you.

5        THE COURT:  Do you have an additional argument as to

6   your opposition?

7        MS. COHEN:  Thank you, Your Honor, yes.  May it

8   please the Court.  Good morning.  Lori Cohen again on behalf of

9   the defendants, along with Mr. Fowler.  I appreciate being

10  here.  I'm here, obviously, on pro hac from Georgia, and, you

11  know, I always hate to be in the court meeting Your Honor for

12  the first time on a motion to compel.  It's certainly not what

13  we want to be doing here today.

14       So I don't mean any disrespect to counsel.  We've

15  actually -- it sounded like we've had a lot of disagreements.

16  We've actually had a very pleasant, I think, good working

17  relationship until this moment --

18       THE COURT:  Okay.

19       MS. COHEN:  -- you know, perhaps.

20       So I don't want the Court to think we've had some

21  kind of, you know, really uncooperative --

22       THE COURT:  Well, you're at the end of discovery, and

23  this is the first time I've seen you, so I assume that that's

24  not the case.

25       MS. COHEN:  Yes.  So, so again, what I want to start

1   with, it's interesting sitting here today, and this is -- I

2   thought it was a very unusual argument.  Again, I'm not trying

3   to cast aspersions on Mr. Phelan because I think I have a lot

4   of respect for him and also Ms. Hinson, but if you look at

5   plaintiffs' brief, and I know Your Honor did --

6           THE COURT:  Yes.

7           MS. COHEN:  -- it was a lot different from what was

8   being argued today.

9           So this brief was first of all, again, as Mr. Phelan

10  did today, an attempt to cast aspersions on my client about all

11  of the, you know, circumstances surrounding the recall of the

12  product, obviously, that's not related to specifically this

13  case.  This case is a different situation, which I'll talk

14  about in a moment.

15          If you look at their motion to compel, I think the

16  first 11 pages are talking about things, as Mr. Phelan did,

17  just kind of throwing, you know, bad comments about our client

18  to the recall and the product, and when you get to the actual

19  argument part, it starts on page 13, I believe, there are three

20  pages of argument -- actually 14, 14 to 17 is the argument, and

21  then the last page is what they're seeking, and it's actually

22  three -- basically three asks, three requests of the Court

23  wholly different from what we heard today.

24          THE COURT:  Well, I don't think it's wholly

25  different.  I think it's an expansion certainly, but I don't

1    think it's wholly different.

2            MS. COHEN:  So again, our opposition, as Your Honor

3    heard and probably read, with the declaration of Mr. Fowler

4    attached, I think we try to go through chronologically exactly

5    what we did in discovery, and we address in our briefing these

6    three topics.  Now, there were a lot of expansion, I agree with

7    that term, certainly an expansion.  All the -- the last part of

8    Mr. Phelan's argument about the different interrogatories,

9    requests for production, not part of this motion.

10            So there hasn't been a meet and confer on those

11    issues.  We certainly can sit down with them if -- you know, as

12    we did in the hallway, but again, we focused on the three

13    categories of documents.

14            Also, I would add that plaintiffs in this entire

15    brief do not cite any statute, do not cite any law.  We tried

16    in our opposition --

17            THE COURT:  I already know what the law is.  I do

18    discovery motions every single week.

19            MS. COHEN:  Okay.

20            THE COURT:  So I certainly don't need that explained

21    to me.

22            MS. COHEN:  Okay.

23            THE COURT:  Okay.

24            MS. COHEN:  So anyway, again, we focus on those three

25    categories of documents.

1          Now, Mr. Phelan did talk when he stood up here about

2     again his package of information that he passed out.

3          THE COURT:  Yes.

4          MS. COHEN:  Much of this, Your Honor, does not relate

5     to the Overton case.  There are articles in here, the pictures,

6     I think you know this is not the Overton child.

7          THE COURT:  I know that.

8          MS. COHEN:  These are things we're seeing for the

9     first time.

10          THE COURT:  He explained that.  Yes, I understand

11     that.

12          MS. COHEN:  Letters from other counsel.

13          So again, this is not part of the record, not

14     something that we --

15          THE COURT:  Look, all I've looked at from what he

16     handed me was the pictures in the beginning, the

17     interrogatory -- the objections to the interrogatories and

18     objections to requests for production of documents, and really

19     that's it.  So I don't think that there's a whole lot here that

20     I've reviewed that will make any difference in terms of your

21     ability to argue this motion, so why don't we get to it.

22          MS. COHEN:  Okay.  Thank you, Your Honor.

23          So again, as we've said, I think, pretty clearly in

24     our opposition and with Mr. Fowler's declaration, we have gone

25     to great lengths in this case to meet our discovery

1  obligations.  Now, Mr. Phelan talked about a 30(b)(6)

2  deposition.  I think it was clear but I do want to make this

3  very clear on the record, there's been no deposition of our

4  corporate witnesses in this case so far nor a 30(b)(6), and

5  that's not because of us.  They literally just asked for the

6  first time last week, and so we're working on scheduling them.

7      So comments about what 30(b)(6) witnesses had to say

8  in depositions are not in this case, and they're not -- no

9  comments were made about impossibility of standing up or

10  restraints.  So there were a lot of comments by Mr. Phelan when

11  he stood up here about witnesses that haven't happened yet.

12  They were in other cases.  Now, whether they will say something

13  similar is another story, but again, they just asked for

14  depositions.  They'll be taken probably in January under our,

15  our discussion and our agreement.

16      THE COURT:  Okay.

17      MS. COHEN:  So again, that, I think, was, was related

18  to another case.

19      In this case, what we have from the records in terms

20  of restraints, as I think Mr. Phelan brought that up, is we

21  have reports from the detectives, we have reports from the

22  police, reports from the CPSC, saying that this child was not

23  restrained.  So that will be part of the evidence that comes

24  forward.  I just felt the need to explain that because it's

25  wholly different from what Mr. Phelan said in terms of the

1    restraint issue.

2          But putting that factual part aside, if you look,

3    Your Honor, at the sequence of discovery in this case, we did

4    negotiate initially a -- the, the joint agreement, which I have

5    here.

6          THE COURT:  Yes.

7          MS. COHEN:  And I think what's important in this --

8    and we again had a very good discussion, we've had good

9    dialogue and communication all long -- if you look at page 3 of

10   the joint report, what it says, and Mr. Phelan didn't read this

11   part, on paragraph 6, it says:  The parties further agree that

12   new ESI searches and custodian records collections are not

13   necessary provided that defendants reproduce the *Goodrich* and

14   *Torres* production in this case.

15         THE COURT:  Do you really think that they were

16   waiving their ability to get all documents since the *Goodrich*

17   and the other case, in that several-year time period?

18         MS. COHEN:  Not at all.

19         THE COURT:  Okay.

20         MS. COHEN:  And, Your Honor, the, the *Goodrich* ones,

21   again, even though the event was 2014, the production was 2016.

22   So again, it's talking about 2014.  Obviously, the production

23   covered up until 2016, but I'm not arguing that they waived

24   that at all.  In fact, what I'm going to tell you and what I

25   think our brief told you and what I hope our declaration told

1   you is that we have, in fact, produced a significant amount of

2   documents.

3         And I think you have the numbers in our, in our

4   descriptions.  We've had three productions.  We did our

5   objections timely.  We did our responses timely.

6         There's some questions about some of them, you know,

7   we certainly should meet and confer before Your Honor strikes

8   objections, because that was the first time I heard about those

9   numbers today when Mr. Phelan stood up.  He never raised it

10  with us before.  We're happy to look at those.

11        Our productions, the first one was October 17.  The

12  second one was November 6.  The third one was, was on

13  December 5.  We've produced some over 2,000 documents, over

14  13,000 pages.

15        So while on the one hand it's not, you know, as much

16  as some cases, but it's certainly significant.  It's certainly

17  what we agreed to.  It's certainly beyond just reproducing the

18  *Goodrich* and *Torres*, Your Honor.  That was our agreement, that

19  we would meet and confer and do that, and we did that.

20        So again, we -- if we look at the productions, each

21  time we've, we've made our productions, and they went beyond

22  the *Goodrich* and *Torres*, and we agreed to that.

23        So going to their specific categories, Your Honor,

24  which is the -- again, if you look at their briefing --

25        THE COURT:  Yes.

1          MS. COHEN:  -- and the conclusion page, so

2     specifically just to tell you where we stand on, on what was

3     in, in the motion, so first, all documents concerning or

4     regarding any and all pre- and post-market testing to determine

5     whether it was safe at night.  We produced --

6          THE COURT:  Which number was this again?

7          MS. COHEN:  Yes.  This is No. 1, Your Honor, on

8     page --

9          THE COURT:  Okay.

10          MS. COHEN:  Just using their lists, on page 18, their

11    conclusion of plaintiffs' motion to compel, which we obviously

12    responded to and what we focused on for today, all the testing

13    documents before and after, so our response to that is the

14    productions we made --

15          THE COURT:  But, but here's the thing:  When I look

16    at No. 18 -- this is the one you just said, correct?

17          MS. COHEN:  Page 18, I'm sorry.  Page 18 of the -- I,

18    I was going by the plaintiffs' --

19          THE COURT:  Which request number are you talking

20    about?

21          MS. COHEN:  Well, actually it was plaintiffs' motion

22    to compel.

23          THE COURT:  I'm looking at plaintiffs' motion to

24    compel --

25          MS. COHEN:  Oh.

1          THE COURT:  -- and the interrogatories that were

2     attached to it.

3          MS. COHEN:  Okay.

4          THE COURT:  My question is which interrogatory or

5     which request for production are you talking about?  Which

6     number?

7          MS. COHEN:  Well, I'm really just looking at the

8     conclusion of their brief, their category.

9          THE COURT:  Well, I'm looking at the actual

10     responses --

11          MS. COHEN:  Okay.

12          THE COURT:  -- because what I'm concerned about is

13     the objections that were made and that you've stood on when you

14     answered.

15          For instance, you said their request No. 18 was

16     documents concerning or relating to testing or the safety or

17     efficacy of the Rock 'n Play crotch step -- strap.

18          MS. COHEN:  Yep.

19          THE COURT:  You object on the basis of being

20     burdensome, blah, blah, blah.  Then you say because it goes

21     back ten years involving every model, including models other

22     than the product, for instance, and you have other objections

23     that are similar to that.

24          And then when you answer, you rely on those

25     objections.  You still say, "Subject to our objections."

1          So when I look at that, I have to agree with the

2     plaintiff that I really couldn't -- I wouldn't be able to tell

3     whether you are answering that completely with regard to all

4     models or generally and not just the model at issue in this

5     case.

6          MS. COHEN:  And, Your Honor, I will say that we've

7     had, and I think they were attached to Mr. Fowler's

8     declaration, a number of letters back and forth,

9     communications, and I think in our opposition, we made clear

10    even though we asserted and initially asserted an objection

11    that we were going to focus on this model and we certainly have

12    that argument that we would want to reserve for trial for

13    admissibility, putting that aside, we did not restrict --

14          THE COURT:  But how would anyone know that?  Because

15    that's not what you said in your answers.  That's the problem.

16          MS. COHEN:  All right.

17          THE COURT:  If you were going to waive that

18    objection, you could have said so and answered it completely,

19    but you didn't.  You said -- in every one of your responses,

20    you've said, "Subject to and without waiving our objections."

21          MS. COHEN:  Right.  And I think in our letters that

22    we -- that are production letters, we made clear and we have

23    the sequence of them attached to Mr. Fowler's declaration,

24    we're happy to go back and revise the actual responses.

25          THE COURT:  Okay.

1           MS. COHEN:  That's not a problem, Your Honor.  I

2   mean, the first time we heard that they wanted us to revise

3   those was today, so I don't mean to be disrespectful of the

4   Court or counsel, but we're happy to do that piece of it, but

5   what I was focusing on in the meet and confers and in their

6   motion to compel is the documents, because that's all they

7   asked for.

8           THE COURT:  Okay.

9           MS. COHEN:  So the first time I'm hearing that they

10  want the -- these revised is today.

11          THE COURT:  Well, I think -- I gotta tell you, I

12  think it's part and parcel because their, their concern was

13  whether you were not disclosing all documents, other incidents,

14  and so forth and so on because of your restrictions in your

15  objections.  So I think that it's part and parcel the same

16  thing.

17          MS. COHEN:  I understand that, Your Honor.

18          THE COURT:  Okay.

19          MS. COHEN:  And if you look at our declaration,

20  though, in our attached letters, we try to make it clear, if

21  Mr. Phelan had said, hey, Lori or Mr. Fowler -- Ms. Cohen,

22  Mr. Fowler, can you also in addition to this letter, these are

23  the -- these are our PDs and the rogs that I have trouble

24  with -- can you go back and revise them, we would have done it,

25  but we didn't have that discussion.  We had --

1          THE COURT:  Then why are we arguing?

2          MS. COHEN:  And we --

3          THE COURT:  So you're fine with it.  Why are we

4     arguing about it then?  Let's move on.

5          MS. COHEN:  Well, because the document part is what,

6     where we have, you know, I think it's important to have Your

7     Honor weigh in on, which is, which is again, just looking at

8     the categories that were again part of their motion, page 18,

9     one was asking us for all pre- and post-market testing.

10          THE COURT:  Yes.

11          MS. COHEN:  And our position there and what we said

12     in our briefing and what we told them is that we had produced

13     numerous testing documents.  We produced everything in the

14     *Goodrich* and Torres, we reproduced those.

15          I heard today that there's a question about whether

16     they received the video again, and we're happy to reproduce it

17     in this case.  I think they had that, but we're happy to

18     reproduce that.

19          But beyond that, where, where we are drawing the

20     line, if you will, again subject to Your Honor's, you know,

21     direction and ruling, is on ESI.

22          So again on the testing part, we thought we had an

23     agreement in the joint report, as in paragraph 6, that we would

24     basically produce testing documents from *Goodrich*, from Torres.

25     We would not redo ESI because that was our agreement.

1            THE COURT:  What about testing beyond *Goodrich* time

2    period?  I mean, what about testing from, what was that, 2014

3    to, to 2019 -- or '18, rather?

4            MS. COHEN:  2016, which is when we did the

5    production.

6            THE COURT:  Okay.

7            MS. COHEN:  Those have been produced.  So that's what

8    we're saying.  We've produced all the testing documents.

9            THE COURT:  Well, what about from that period through

10   2000 -- through the recall?

11           MS. COHEN:  We, we have produced all the testing

12   documents up until the, you know --

13           THE COURT:  No, I don't know.

14           MS. COHEN:  Up until, up until the recall.  So -- and

15   if we have to --

16           THE COURT:  Is that what you said?

17           MS. COHEN:  I think that is what we said.

18           THE COURT:  I don't think so.

19           MS. COHEN:  Other than, other than electronic

20   documents related to testing, so actual testing documents, yes,

21   and we're happy to -- I think we've said that in our, in our

22   responsive brief, in our --

23           THE COURT:  Why not ESI?

24           MS. COHEN:  Not ESI.

25           THE COURT:  Why not?

1          MS. COHEN:  Because we had an agreement in this case

2     per --

3          THE COURT:  Okay.

4          MS. COHEN:  -- the joint report not to produce

5     ESI-related testing.

6          THE COURT:  All right.  Let's go ahead.

7          MS. COHEN:  So that's, that's the one piece of it

8     that I thought was important to clarify.

9          THE COURT:  Okay.

10         MS. COHEN:  Other than that, yes, we've produced

11    numerous testing documents.  And so that's our -- that's what

12    we've done on that point.

13         THE COURT:  Okay.

14         MS. COHEN:  On the recall-related documents, really

15    again the same position.  So we negotiated the joint discovery

16    plan.  We agreed that we would do our best to produce recall

17    documents that the parties would negotiate and work in good

18    faith was the language, that we would, again, not redo ESI,

19    that we would produce what we had non-ESI format, and that's

20    what we've done.

21         THE COURT:  Okay.

22         MS. COHEN:  So that again is, is where we fall on

23    that, Your Honor, that we are not redoing the ESI because that

24    was our agreement under the joint discovery report, but that we

25    did produce them in December 5 production, production 3 of our

1   productions, recall documents.

2              THE COURT:  Okay.

3              MS. COHEN:  So we think we've done that other than,

4   than opening up ESI.

5              THE COURT:  All right, thank you.

6              MS. COHEN:  And then on the -- then, I think, the

7   last category, which I think is, is the one that I thought we

8   were really in most debate about, again, on plaintiffs' motion,

9   items 1 and item 3, we believe we have done that other than

10  ESI.

11             On No. 2, which is the incidents, we had a lot of

12  discussion about that, Your Honor, for all of the pre-Overton

13  death, December 2017, using that as the time frame, everything

14  prior to that we have produced in terms of incidents.

15             Now, Mr. Phelan and I discussed in the hallway there

16  may be some of these, like, non-death or

17  non-breathing-interruption cases.  We'll go back and confirm

18  for him that again.  If it's not -- if it's not a death but

19  it's a breathing interruption that we've produced that we

20  believe we have, we'll make that perfectly clear.

21             And our position, as I've said on our calls, in our

22  opposition brief, and I'll say today in the court, is that we

23  believe the pre-Overton death incidents, you know, again we

24  don't -- we're not, obviously, waiving or arguing admissibility

25  today because we think that's for another day, but we have

1  produced those for discovery purposes.

2         We believe that subsequent incident documents are not

3  discoverable and not admissible under the law we've cited in

4  our opposition.

5         THE COURT:  Yes.

6         MS. COHEN:  And we -- and that's why we drew the line

7  on that.  Again, not to be intransigent, not to be difficult.

8  We wanted to be compliant and meet our discovery obligations,

9  and we thought that was a clean line.  We would produce

10 everything pre-death and not produce post.

11        THE COURT:  I understand.

12        MS. COHEN:  We again think, think that none of it's

13 admissible ultimately other than if they meet the substantial

14 similarity test that I know Your Honor is certainly familiar

15 with, but that's where we kind of drew the line on that.

16        THE COURT:  All right, thank you.

17        All right, I -- I'm not sure that the parties have a

18 real agreement as to what you negotiated, and I'm not sure that

19 it's very clear that it should be so limited as the defendants

20 suggest.  As I said, the problem that I've got with the

21 interrogatory answers and the requests for production and the

22 document production responses is that every one of them says

23 subject to and without waiving the objections that you made

24 originally, and the objections that you made originally, I

25 believe, are not appropriate.  I think that they're too

1    restrictive.

2           I understand and agree that post-death incidents may

3    or may not be admissible, probably are not going to be

4    admissible, but I believe that they should be discoverable in

5    this case, as in addition, the same, I believe, in discovery,

6    discovery purposes apply to testing the communications

7    regarding the recall and other testing that may have occurred

8    afterwards.

9           I'm going to strike the objections in the

10   interrogatories and requests for production of documents.

11   You're going to have to re-answer them not subject to the

12   objection so that he's got an answer that he knows whether

13   it's, it's complete or not.

14          I'm also going to order that you make more specific

15   reference to Bates numbers, especially with regard to, to

16   the -- well, that they have to be specific as to Bates numbers,

17   not, you know, general ranges but, but specific.

18          I am going to make it apply to, just for

19   clarification, all models and all near fatalities or other

20   injuries that are similar in nature in terms of possible

21   suffocation standing, rolling over, anything like that that

22   would relate to this.

23          I know he said that there was a mold issue.  They're

24   not interested.  I agree that that wouldn't be relevant.  I

25   don't know that there's anything else out there that's so

1    irrelevant similarly, so you wouldn't have to do that, but

2    anything that's in any way, shape, or form similar to what

3    happened in this case is going to have to be produced.

4         And I, I gotta tell you that given all the litigation

5    over this, the number of deaths that have occurred, the number

6    of cases that you've had, and I know that there were two

7    several years ago, I have a hard time believing that you don't

8    already have this, frankly, and I bet you do.  I bet you

9    already have it segregated.

10        So I'm going to order that you supplement your

11   responses by next Friday.  If you need a few days more for ESI,

12   I'll ask you-all to talk about that and get that promptly done,

13   but I expect that you probably already have all of this stuff

14   ready.

15        So we're at the end of the discovery period, so

16   that's why I'm pushing you to get this done.  Any questions?

17        MR. PHELAN:  No, Your Honor.  Oh, well, there's just

18   one.  Some of the other incident evidence produced is produced

19   in this format.  Let me give Ms. Cohen a copy.

20        And as you can see, it's heavily redacted.

21        THE COURT:  Redacted?  Why is it redacted?

22        MS. COHEN:  It's personal health information.  It's

23   confidential information but other --

24        THE COURT:  Just make it -- no, we're just going to

25   make it subject to Attorneys' Eyes Only -- not Attorneys' Eyes

1   Only -- subject to a protective order.  Attorneys, experts, I

2   don't know, I mean, that's -- it just wouldn't be disseminated

3   beyond what is necessary for this case, and so --

4           MS. COHEN:  Your Honor, we still -- we still have

5   concerns about that in terms of putting patients' names in

6   there.  I mean, I think that that --

7           THE COURT:  You can delete the name.

8           MS. COHEN:  Delete the names.

9           MR. PHELAN:  Well, the infant's name, but what about

10  the parent, who is potential witness as to another incident?

11          THE COURT:  Okay.

12          MS. COHEN:  And, Your Honor, we felt strongly that we

13  should be able to redact the names and the identifying -- if

14  they think that it's so, so --

15          THE COURT:  But you're not a health care provider, so

16  why do you need to redact it?

17          MS. COHEN:  I think -- well, the other, the other

18  reasons is I think the plaintiff should have the burden of

19  looking at it, and if they believe it's substantially similar,

20  have that argument.

21          THE COURT:  We're at the end of the discovery period.

22  We don't have time for that.

23          MS. COHEN:  But --

24          THE COURT:  Just go ahead and produce it.  It's

25  subject to the protective order, so it's not going to be

1  disseminated further.

2          MS. COHEN:  Well, we have concerns about, about

3  counsel contacting these witnesses potentially for this.

4          THE COURT:  So he might.  All right.

5          MS. COHEN:  And I, I did have one other question,

6  Your Honor, if I may?

7          THE COURT:  Yes, sure.

8          MS. COHEN:  On the, on the striking of the

9  objections, those relate -- that relates to the specific ones

10 that counsel raised?

11         THE COURT:  No, all of them, because I think that

12 they're all improper, and you've repeated them in every single

13 one practically.  They're all stricken.  It has to all be

14 re-answered.

15         MS. COHEN:  Okay.

16         THE COURT:  They need to have a fixed target.

17         All right, Court stands in recess.

18         MS. COHEN:  Thank you, Your Honor.

19                         (Which were all the proceedings

20                          had at this time.)

21              CERTIFICATE OF THE TRANSCRIBER

22     I certify that the foregoing is a correct transcript from

23 the official electronic sound recording of the proceedings in

24 the above-entitled matter.

25                      _____/s/_____
                             Anneliese J. Thomson